

# UNITED STATES DISTRICT COURT

## FOR THE DISTRICT OF RHODE ISLAND

HAKAN YALINCAK,                          :
                                         :
    Plaintiff,       :
                                         :
v.                                       :  CASE NO.
                                         :  (Jury Trial Demanded)
CORNELL COMPANIES, INC.;                 :
WARDEN WAYNE T. SALISBURY, JR.;          :
ASSOCIATE WARDEN JOHN DOE 1;             :
JEAN SINGLETON; LINDA LUGO;              :
JUNE M. CARLTON; PATRICK TOOLIN;         :
FRANK BOTELLO; JOHN DOE 2 A/K/A          :  **CA 08 57T**
"C.O. BUCKLESS"; JANE DOE 1              :
A/K/A "C.O. FALCON"; JANE DOE 2          :
A/K/A "C.O. MORALES"; JOHN DOE 3         :
A/K/A "SGT. GOMES"; JANE DOE 3           :
A/K/A "NURSE MAUREEN"; JANE DOE 4        :
A/K/A "NURSE LISA"; LUIS A.              :
CERBO; JOHN RIEDEL; JOHN DOE 4           :
A/K/A "LT. MOUGENOT"; AND JOHN           :
DOE 5 A/K/A "SGT. DOE 5";                :
                                         :
    Defendants.      :

## COMPLAINT AND JURY DEMAND

  Plaintiff Hakan Yalincak, appearing Pro Se, alleges upon
personal knowledge with respect to his own actions and upon
information and belief with respect to all other matters:

### PRELIMINARY STATEMENT

  1. The Plaintiff, Hakan Yalincak (hereinafter the
"Plaintiff" or "Mr. Yalincak"), brings this lawsuit as a result of
the grossly inadequate and inhumane level of medical care he received
while he was incarcerated at the Donald W. WYatt Detention Facility
("Wyatt"), as a pretrial detainee from June 16, 2005 to January 5,
2007. The inhumane and unconstitutional system of health care at

Wyatt is the direct cause of the permanent physical damage and profound mental and physical pain sustained by the Plaintiff.

2.      Wyatt is a correctional facility owned by the Central Falls Detention Facility ("CFDF"), a public corporation controlled by the City of Central Falls, and operated by Cornell Correction of Rhode Island, Inc. ("CCRI"), a private corporation controlled by Defendant Cornell Companies, Inc. ("Cornell"). Upon information and belief, specifically Cornell's 2006 Annual Report filed with the Securities and Exchange Commission ("SEC"), Cornell's primary clients are the U.S. Marshals Service ("USM"), the Federal Bureau of Prisons ("BOP"), and Immigration And Customs Enforcement ("ICE") division of the Department of Homeland Security ("DHS") (collectively, the "DOJ") pursuant to a written contract with the respective DOJ Agencies. Presently, Cornell houses more than 1,000 pretrial detainees and immigration detainees at Wyatt, most from the State of Connecticut, State of Rhode Island, and State of Massachusetts. During the Plaintiff's pretrial detention at Wyatt, the facility had a capacity of 357 beds and housed between 300-400 inmates. The new additions in inmates are as a result of new expansions by the facility during calendar year 2007 to include women and other detainees.

3.      The health care system at the Wyatt facility is broken. Medical professional staffing levels at Wyatt are grossly inadequte. Defendants routinely refuse to provide prisoners at Wyatt with treatment for their serious chronic medical conditions. When prisoners arrive at Wyatt, Defendants routinely and arbitrarily switch and discontinue drug regimens that were carefully developed

-2-

and calibrated by medical professionals, without consultation
with the affected patients and without regard to the negative
therapeutic consequences. Wyatt provides no physical therapy;
its personnel simply disregard explicit instructions in medical
records to provide this treatment. Serious mental health needs,
even in cases of attempted, or completed suicide, are routinely
ignored.

4.      By allowing this broken medical system to continue
as detailed in this Complaint, the Defendants have permanently
harmed the Plaintiff, and many other prisoners at Wyatt; have
precipated and otherwise avoidable acute medical crises such as
MRSA; have caused many men at Wyatt to experience chronic and
debilitating pain and suffering; and have contributed to the
needless disfigurement, and serious physical injury of the Plaintiff
and others at Wyatt.

5.      Prisoners incarcerated at Wyatt depend wholly upon
their custodians to provide Constitutionally adequate care. Wyatt
has also specifically agreed in its contract with the respective
DOJ Agencies that it will provide the Plaintiff, and all prisoners
housed at Wyatt, with medical services that are commensurate with
community standards. Defendants' generally applicable policies,
guidelines, and practices have all contributed to Wyatt's failure
to respond adequately to the Plaintiff and other prisoners' serious
medical needs. Through these unlawful policies and practices,
Defendants manifested a pervasive and deliberate indifference to
the medical, and mental health needs of the Plaintiff. As a result
Defendants knowingly and willfully denied the Plaintiff, while he

was incarcerated at Wyatt, his right to adequate medical care in violation of the U.S. Constitution, federal law, common law, and contract.

6.     Upon information and belief, the deficiencies and deprivations described above and detailed in the Complaint are the result of Defendant Cornell's aggressive efforts to cut costs and boost profits, and its glaring failure to ensure that its employees fulfill the federal duty Cornell has undertaken to provide.

7.     As a result of the physical and mental injuries sustained by the Plaintiff as a direct result of the Defendants conduct, the Plaintiff seeks relief from this Court.

<u>PARTIES</u>

8.     Plaintiff, Hakan Yalincak (the "Plaintiff" or "Mr. Yalincak"), is a 23-year old Turkish citizen, and resident of the State of Connecticut, who was incarcerated at Wyatt between June 16, 2005 and January 5, 2007 as a pretrial detainee. This was Mr. Yalincak's first, and only time being incarcerated, as he had no previous criminal record. During his incarceration at Wyatt, the Plaintiff was wholly dependent on the Defendants for the delivery of care to address his health care and mental care needs.

9.     Defendant Cornell Companies, Inc. ("Cornell") is a for-profit corporation formed and existing under the laws of the State of Delaware, and having its principal place of business at

1700 West Loop South, Suite 1500, Houston, Texas 77027. Cornell
is in the business of building, owning, operating, and managing
correctional, detention, mental health, and residential treatment
facilities in the United States. Cornell is a publicly-traded
corporation and is listed on the New York Stock Exchange under
the ticker symbol "CRN". As of December 2006, Cornell reports that
it operates a total of 76 correctional, detention, and mental
health facilities, with a capacity of over 18,356 beds. In 2006,
Cornell had revenues totalling $360 million and profits of over
$11.8 million. One of the correctional facilities built, owned,
operated, and managed by Cornell, pursuant to a written contract
with the United States Department of Justice through the BOP
and USM, is Wyatt. At all times relevant to this Complaint,
Defendant Cornell had undertaken the duty to provide Constitutionally
adequate medical care owed to Plaintiff by the BOP and USM. A
copy of the 2006 Annual Report for Defendant Cornell, detailing
the foregoing, is attached hereto as Exhibit A.

10.    Defendant Warden Wayne T. Salisbury, Jr. ("Salisbury")
was, at the time of the events giving rise to this complaint, the
Warden for the Donald W. Wyatt Detention Facility ("Wyatt"), located
at 950 High Street, Central Falls, Rhode Island 02863, and was
responsible for the care and custody of the inmates at Wyatt.

11.    Defendant Associate Warden John Doe 1 ("Doe 1") was,
at the time of the events giving rise to this complaint, the
Associate Warden for the Donald W. Wyatt Detention Facility ("Wyatt"),
and was responsible for the care and custody of the inmates at
Wyatt.

12.     Defendant Jean Singleton ("Singleton") was, at the time of the events giving rise to this complaint, the Senior Counselor and Program Administrator for the Donald W. Wyatt Detention Facility ("Wyatt"), and was responsible for the care and custody of the inmates at Wyatt.

13.     Defendant Linda Lugo ("Lugo") was, at the time of the events giving rise to this complaint, the Senior Counselor and Program Administrator for the Donald W. Wyatt Detention Facility ("Wyatt"), and was responsible for the care and custody of the inmates at Wyatt.

14.     Defendant Patrick Toolin ("Toolin") was, at the time of the events giving rise to this complaint, the Counselor for C-Pod at the Donald W. Wyatt Detention Facility ("Wyatt"), and was responsible for the care and custody of the inmates at Wyatt.

15.     Defendant June M. Carlton ("Carlton") was, at the time of the events giving rise to this complaint, the Counselor for A-Pod and B-Pod at the Donald W. Wyatt Detention Facility ("Wyatt"), and was responsible for the care and custody of the inmates at Wyatt.

16.     Defendant Frank Botello ("Botello") was, at the time of the events giving rise to this complaint, a Captain at the Donald W. Wyatt Detention Facility ("Wyatt"), and upon information and belief, is now a Major, and was responsible for the care and custody of the inmates at Wyatt.

17.     Defendant Jane Doe 1 a/k/a  C.O. Falcon ("Falcon") was, at the time of the events giving rise to this complaint, a

correctional officer at the Donald W. Wyatt Detention Facility
("Wyatt"), and was responsible for the care and custody of the
inmates at Wyatt.

18.     Defendant Jane Doe 2 a/k/a C.O. Morales ("Morales")
was, at the time of the events giving rise to this complaint,
a correctional officer at the Donald W. Wyatt Detention
Facility ("Wyatt"), and was responsible for the care and custody
of the inmates at Wyatt.

19.     Defendant John Doe 3 a/k/a Sgt. Gomes ("Gomes")
was, at the time of the events giving rise to this complaint,
a Sergeant at the Donald W. Wyatt Detention Facility ("Wyatt"),
and was responsible for the care and custody of the inmates at
Wyatt.

20.     Defendant Jane Doe 3 a/k/a Nurse Maureen ("Maureen")
was, at the time of the events giving rise to this complaint,
a nurse in the medical department of the Donald W. Wyatt Detention
Facility ("Wyatt"), and was responsible for the care and custody
of the inmates at Wyatt.

21.     Defendant Jane Doe 4 a/k/a Nurse Lisa ("Lisa") was,
at the time of the events giving rise to this complaint, a nurse
in the medical department of the Donald W. Wyatt Detention
Facility ("Wyatt"), and was responsible for the care and custody
of the inmates at Wyatt. Upon information and belief, Lisa left
her employment at the Wyatt Facility in or about 2007.

22.     Defendant Luis A. Cerbo ("Cerbo") was, at the time of
the events giving rise to this complaint, a psychologist in the
medical department of the Donald W. Wyatt Detention Facility

("Wyatt"), and was responsible for the care and custody of the inmates at Wyatt.

23.    Defendant  John Riedel ("Riedel") was, at the time of the events giving rise to this complaint, the medical doctor in the medical department of the Donald W. Wyatt Detention Facility ("Wyatt"), and was responsible for the care and custody of the inmates at Wyatt.

24.    Defendant John Doe 4 a/k/a Lieutenant Mougenot ("Mougenot") was, at the time of the events giving rise to this complaint, a Lieutenant on third shift at the Donald W. Wyatt Detention Facility ("Wyatt"), and was responsible for the care and custody of the inmates at Wyatt.

25.    Defendant John Doe 5 a/k/a Sergeant Doe 5 ("Doe 5") was, at the time of the events giving rise to this complaint, a Sergeant at the Donald W. Wyatt Detention Facility ("Wyatt"), and was responsible for the care and custody of the inmates at Wyatt. Sergeant Doe 5 is a brown to dark skinned individual, who reports to have an "Irish-mix" in his background; is between 5'10 and 6' in height; and was promoted to the rank of Lieutenant in or about 2007.

26.    At all times pertinent hereto, all of the above named individual Defendants were employees, agents, or subcontractors of Defendant, Cornell, and were acting within the scope of their employment, agency, or contractual obligations and under color of state law. Cornell is responsible and liable for the acts, and omissions of each Defendant pursuant to the doctrine of respondeat superior.

-8-

## JURISDICTION AND VENUE

26.     Jurisdiction is conferred upon this Court pursuant to 28 U.S.C. §§§1331, 1332(a)(1), and 1367(a). These claims arise under the Constitution and the laws of the United States, including provisions of the Eighth Amendment to the Constitution of the United States and 42 U.S.C. §1983. The Court also has diversity, and pendant jurisdiction over all state law claims.

27.     This Court has personal jurisdiction over each of the Defendants as they either reside or transact business in the State of Rhode Island.

28.     Venue is proper pursuant to 28 U.S.C. §1391.

## STATEMENT OF FACTS

A.     CORNELL'S PER DIEM RATE WITH THE DOJ (USM, BOP, AND ICE)

29.     The Wyatt Facility was financed with municipal bonds issued through the Rhode Island Port Authority in the summer of 1992 and opened in 1993.

30.     Pursuant to federal law, the USM, the BOP, and ICE, i.e., divisions within the DOJ, generally have the authority to designate the place of any prisoner's prtrial detention and/or incarceration. However, the federal government is able to reduce its expenditures for those prisoners, and thus meet budgetary constraints, by housing such prisoners at private prisons such as Wyatt. Specifically, according to Cornell's Corporate filings with the SEC, "revenues has been generated under contracts specify a net rate per day per resident, or per diem rate." This rate for Wyat is approximately $83 per inmate, per day, while in a non-private prison, according to the Bureau of Prisons ("BOP"), it costs

the federal government between $194 and $250 per inmate, per day.
Thus, by housing a portion of its pretrial detention population
in private prisons, the USM is able to reduce its expenditures
for those prisoners, and meet budgetary constraints.

## B.   CORNELL'S OBLIGATION TO PROVIDE CONSTITUTIONALLY ADEQUATE MEDICAL, DENTAL, AND MENTAL HEALTH CARE

31.     Upon information and belief, the Cornell Companies
through a contract with the USM, BOP, and ICE, i.e., divisions
of the DOJ (hereinafter the "Wyatt Contract") agreed to provide to,
and for the benefit of Wyat prisoners, such as in the Plaintiff's
situation, Constitutionally adequate medical and mental health
care. The Wyatt Contract spells out in great detail the services
that Cornell is required to provide to, and for the benefit of,
Wyatt prisoners:

a.     Cornell is required to provide "all essential health
services" and to adhere to "the U.S. Constitution,"
and "all applicable Federal, state and local laws and
regulations governing the delivery of health services
and establish the necessary quality controls to ensure
all policies and procedures are designed and implemented
in a manner to promote orderly and efficient delivery
and management of health services to the inmate
population."

b.     Cornell is required to have written plans and procedures
for "providing urgent medical, health, mental health
and dental services...includ[ing] but not limited to,
the following: (1) 24 hour-a-day, seven day-a-week
emergency medical, health, mental health and dental
care; (2) initial health screening; (3) health appraisal
examination; (4) daily triaging of complaints; (5) sick
call procedures; (6) special medical programs and
services for, but not limited to, inmates with chronic
needs or requiring convalescent care; (7) mental health
and substance abuse services; (8) staffing/health care
specialist; (9) ancillary services-radiology, laboratory,
etc.; (10) dental services-routine and emergency;

(11) pharmaceutical services and supplies;
(12) optometric services; (13) health education;
(14) medical diets; (15) infectious diseases; and
(16) quality control/peer reviews."

c.    Cornell is required to submit "all plans, policies
and procedures" at Wyatt, including but not limited to
training materials, to the respective DOJ Agency for
"review and concurrence." Cornell is prohibited from
making modifications to those plans, policies and
procedures without the respective DOJ Agency's
acknowledgement.

d.    Cornell is required to submit all proposed hirings of
personnel at Wyatt to the DOJ. THe respective DOJ
Agency, i.e., USM, BOP, and/or ICE, alone may grant
approval for the employment of any personnel at
Wyatt. Such Agencies are "the final approval authority
for all [Wyatt] staff who work with Federal inmates..."

e.    "[E]ach phase of the services rendered under [the Wyatt
Contract] is subject to [BOP/USM/ICE] inspection both
during operations and after completion of the tasks."
The contract provides for on-site BOP/USM/ICE personnel
to "monitor contract performance" by Cornell.

f.    The Cornell Contract provides that an on-site USM/BOP/
ICE representative, known as the "Contracting Officer's
Representative," act as the "contract monitor" and
be "responsible for the technical direction of the
performance of all work under [the Wyatt] Contract."

g.    The contract mandates that Wyatt comply with the Uniform
Building Code, the Building Officials and Code
Admnistrators National Building Code (BOCA), and the
Standard Building Code if mandated by the State of Rhode
Island, and if not, BOCA, as well as the Architectural
Barriers Act of 1968, the Rehabilitation Act of 1973,
and the Uniform Federal Accessibility Standards.

h.    Cornell is required to submit final "design/construction
documents" to the USM/BOP/ICE, and allow "periodic
visits...to verify...compliance with contract
requirements."

32.    The Wyatt contract is a fixed price contract providing

for a set payment to Cornell per time period, irrespective of

Cornell's costs of providing the services, including health care

services, required by the USM/BOP/ICE. Thus, to the extent that

Cornell is able to reduce the costs of the medical and mental
health services offered at Wyatt, Cornell's profits are
increased.

C.    DEFENDANTS' UNCONSTITUTIONAL AND ILLEGAL ORGANIZATIONS,
      SYSTEMS, PATTERNS AND PRACTICES AT WYATT BETWEEN JUNE 16,
      2005 AND JANUARY 5, 2007

33.    It is well known to Defendants that the population
of persons incarcerated in federal prisons suffer from the full
spectrum of routine medical problems found in the general
population, such as fractures, abdominal pains, psychological
disorders, and infectious, as well as chronic diseases such as
asthma, hypertension, epilepsy, diabetes, tuberculosis, and HIV.
It is also well known to Defendants that prisoners suffer from a
higher rate of serious medical, dental, and mental health problems,
chronic conditions, and injuries than does the American population
as a whole.

35.    Defendants were deliberately indifferent to the
Plaintiff's serious medical and mental health care needs during
the period June 16, 2005 to January 5, 2007, as a result of the
Wyatt health care delivery system illustrated below, and detailed
in Part E supra:

a.    Wholly Insufficient Staffing, Training and Supervision--
      The number of qualified health care staff at Wyatt is
      wholly inadequate to provide care to Wyatt's 1,000
      residents. On information and belief, the lone medical
      doctor, John Riedel, who treats and supervises the care
      of all the prisoners at Wyatt also maintains a full-time
      medical practice in a local community. There is only one
      part-time dentist on staff, who sees patients less
      frequently than does the doctor. There is no physical
      therapist on staff or available on a contract basis
      for prisoners. There is only one part-time english
      speaking psychologist, Luis A. Cerbo, who attends to
      prisoners at Wyatt on an irregular basis. The number of

-12-

medical staff is grossly inadequate to meet the
significant and documented medical, dental and mental
health needs of the prisoners at Wyatt. The inadequate
staffing is due, in part, to the fact that Defendants:
(i) do not actively attempt to recruit and hire
sufficient, competent medical staff; (ii) fail to train
and supervise medical personnel; and (iii) are unable
to retain those medical staff members who are hired.
As a consequence of the severe staffing shortage,
corrections officers with little or no health care
training often serve as the gatekeepers for inmates,
as was the case with the Plaintiff, access to routine
and even emergency medical care, leading to acute
medical crises.

b.    Grossly Inadequate Access to Health Care--
Defendants routinely and knowingly fail to provide
prisoners, as was the case with the Plaintiff, with
access to essential health care. Prisoners suffering
from serious and even acute conditions are habitually
and indiscriminately denied treatment. When prisoners
do manage to see the part-time Wyatt doctor, they
are frequently denied care for complex, multi-symptom
ailments on the arbitrary ground that the doctor will
not treat more than one condition per appointment.
There is a substantial backlog of requests for routine
and emergency medical and dental care, resulting in
frequent and dangerously lengthy delays in accessing
care. Prisoners often face substantial delays and
regular denials of treatment when they want to see a
primary physician; when they need a referral to see a
specialist; when they need to be transported to a
specialist for examination after obtaining a referral;
when they need to obtain medical testing; and when
they need treatment. Mental health care services are
wholly inadequate: there is only one trained english
speaking psychologist on staff, and there is no
psychiatrist, thus, the inmates are prescribed
psychotropic medications by the psychologist who makes
a referral to the Wyatt doctor. In addition, physical
therapy services are simply not offered. Prisoners
who have worn glasses for years are simply told that
they no longer need them. On information and belief,
the foregoing is as a result of the Defendants efforts
to avoid the costs of such care.

c.    Denial of Access to Qualified Medical Services Outside
the Facility--
Wyatt medical staff routinely refuse to refer prisoners
to outside health care providers even in situations
where the prisoner's medical, dental, or mental health
conditions far exceed the therapeutic capabilities of
Defendants or their facilities, and where treatment
would be a necessary component of Defendants' obligation

to provide legally mandated care. Defendants' failure
to refer prisoners to off-site specialists has in
some cases resulted in great suffering by prisoners,
and has led to serious, and entirely avoidable, medical
complications. On information and belief, laboratory
and other medical testing services at Wyatt are
routinely delayed, never done, or not reported. By way
of example, there occurred a MRSA outbreak in A-Dorm
in or about August, 2005. In that instance, one inmate
named Eric Smith developed a six (6) inch growth of
pus on his leg, which was left untreated for months
before intervention by his attorney and his sentencing
court. Infectious conditions such as MRSA are not
typically cultured, even though BOP guidelines
recognize that this is an essential step in diagnosing
MRSA, determining an effective antibiotic or treatment
regimen, and avoiding the creation of resistant
strains of the infections and outbreaks among the
prisoners.

d.    Failure to Provide Proper Medications And Arbitrary
      Discontinuation of Prescription Drugs--
      Arriving prisoners' prescription medications are
      routinely confiscated without regard to the impact on
      the prisoner's health. Prisoners often have to wait a
      week or more before receiving substitute medications
      at Wyatt. Determinations regarding medication regimens,
      and the composition of those regimens, are made based
      on the cost of the medications to Cornell rather than
      the best interests of the patient. Prisoners' medications
      are arbitrarily changed to less expensive medications
      without follow up to assess the efficacy and side
      effects of the new medications. As a result, many
      prisoners have simply been denied necessary medication
      altogether as a cost-saving measure for the facility.

e.    Failure to Provide Meaningful Grievance Process--
      The Wyatt administrative grievance system is broken.
      The process involves, first, a "Health Request" and,
      second, a "Grievance to the Warden." However, the
      Wyatt grievance system often does not provide timely
      or adequate responses, and sometimes no response at all,
      about medical, dental, or mental health care. In point
      of fact, Health Requests are always responded to by
      the Wyatt medical department secretary; and the Grievance
      to the Warden, during the Plaintiff's incarceration,
      was addressed by a single staff member, Patrick Toolin.
      In addition, prisoners wishing to grieve about medical
      care they have received (or have not received) are
      frequently stymied by counselors who tell them that
      "today is not a good day to file this grievance," or
      who state that they are "too busy" to take or process
      written complaints. Some prisoners have been cautioned
      that they will no longer receive care because they have

grieved, and have accordingly chosen not to pursue
grievances for fear that they will be denied the
care they need. Additionally, in some instances, medical
staff members, and Wyatt security personnel have
destroyed or disposed of grievances submitted by
prisoners in their care. Prisoners who complain
frequently about the deficiencies in health care have
been punished with "administrative segregation"--
solitary confinement--which is punitive to the
prisoner. Thus, by erecting obstacles to filing
a grievance, and through threats and acts of retribution
Wyatt staff have effectively discouraged or foreclosed
meaningful access to the grievance process for many
inmates.

36.    Despite Defendants' actual and constructive knowledge

of these and other significant failures and deficiencies in the

organizations, systems, policies, and practices for the delivery

of medical, dental, and mental health services at Wyatt, Defendants

have refused or consciously ignored the need to take immediate

actions to protect the Plaintif, and, upon information and belief,

many other prisoners at Wyatt.

D.    CORNELL"S SEVEN KEY PRINCIPLES OF CARE    ("PRINCIPLES OF
      CARE")

37.    THe above described system of health care delivery  is

not only Unconstitutional and Illegal but also violate the very

"Principles of Care" publicly  propagated by Cornell; in sum,

Cornell describes the following as its principles:

    a.    "These principles state that [Cornell's] operations
          must maintain the safety and security of our clients,
          our employees, and the local community."

    b.    "In addition, the principles require that we hold the
          individuals in our care accountable for their actions
          and expect them to assume responsibility."

    c.    "Furthermore, we expect our employees to act as role
          models, to communicate effectively and professionally,
          and to treat our clients with dignity and respect."

    d.    "Finally, our principles call for us to manage
          physically clean and appropriately maintained facilities
          that are safe and conducive to an environment of care."
          (Exhibit A, p.3).

-15-

E.      **DEFENDANTS' ACTS CAUSE HARM TO THE PLAINTIFF**

1.      **November 21, 2005 Incident**

(a)      **The Incident**

38.      When the Plaintiff arrived at Wyatt on June 16, 2005,
he received a skin test for tuberculosis ("TB"), and was
subsequently placed on INH and Vitamin B6 regimen, twice a week
for a six month period under the supervision of Defendant Cornell,
Defendant Riedel, Defendant Salisbury, Defendant Doe 1, Defendant
Maureen, and Defendant Lisa, as well as other individuals in the
Wyatt medical department.

39.      Proximate to the date of Monday, November 21, 2005,
Defendant Lisa provided the Plaintiff with his morning medication
after which the Plaintiff returned to his assigned bed in A-Dorm
from "med-line."

40.      Shortly therafter, the Plaintiff woke up to go to
the bathroom, became lightheaded and informed the correctional
officer on duty and blacked out in the A-Dorm dayroom. Defendant
Falcon was the correctional officer on duty in A-Dorm during this
incident.

41.      Thereafter, the Plaintiff, while semi-conscious, was
taken to the Wyatt medical department where Defendant Riedel began
repeatedly taking the Plaintiff's blood pressure and monitoring his
breathing, which was shallow, and it revealed the Plaintiff's blood
pressure had dropped to 60 over 30, a second blood pressure test
revealed 70 over 30, and the Plaintiff two hours after the incident
was released back to A-Dorm. The Plaintiff was not taken to an outside

hospital, his cries of physical pain (because of his difficulty in breathing) were not addressed and, despite reasonable inquiries by the Plaintiff, the Plaintiff was not informed of why his blood pressure had suddenly dropped to such a low level and why he was gasping for air.

42.    As a result of the November 21, 2005 incident, the Plaintiff complained of pain and discomfort to Defendant Counselor Carlton and Defendant Counselor Toolin, and was recalled to medical later that day for an EKG and two more times the same week.

43.    Shortly thereafter, Defendant Lisa, during afternoon medline, informed the Plaintiff, "I am sorry but I gave you someone else' medication by accident this morning. Are you feeling better now?"

44.    Despite the foregoing, the Plaintiff was never taken to an outside hospital, never informed of what medication he was given that caused his blood prssure to dramatically drop, or seen again by the Wyatt doctor for a follow-up.

45.    Thereafter, the Plaintiff filed four (4) written requests to medical, as well as Defendant Patrick Toolin who was the Grievance Coordinator and not one response was received by the Plaintiff.

          (b)     Harm to Plaintiff

46.    As a result of the foregoing, the Plaintiff was committed to bed rest for a period of five (5) days.

47.    Defendants' deliberate indifference and reckless behavior to Plaintiff's serious medical needs caused avoidable pain, mental health, and deterioration of Plaintiff's health.

-17-

48.    Defendant Salisbury, Defendant Doe 1, and Defendant Riedel knew to a moral certainty that they are charged with administering and providing inmates with Constitutionally adequate medical and mental health care.

49.    Defendant Salisbury, Defendant Doe 1, and Defendant Riedel knew that proper training and supervision of the nursing staff at Wyatt was necessary to adequately provide inmates with Constitutionally adequate medical and mental health care and were deliberately indifferent, grossly negligent, and acted with reckless disregard in administering medical health care to the Plaintiff on November 21, 2005 with excessive risk to his health and safety, and such conduct was done without lawful justification and was designed to and did deprive Plaintiff of his rights guaranteed by the Eighth Amendment to the U.S. Constitution.

50.    The conduct of Defendants Salisbury, Defendant Doe 1, and Defendant Riedel in failing to provide adequate training and supervision to Defendant Lisa and other personnel in the medical department at Wyatt, and their failure to take the Plaintiff to an outside hospital involved reckless or callous indifference to Plaintiff's federally protected rights.

51.    The Defendants' organizations, systems, policies, procedures, practices, acts, and omissions all evidence and constitute cruel and unusual punishment in violation of the Eighth Amendment to the United States Constitution.

2.      September 20, 2006 Incident

    (a)     Background

52.      By way of background, in the period of in or about June 2006 through August 2006, the Plaintiff reported to Defendant Carlton, Defendant Singleton, Defendant Lugo, Defendant Toolin, Defendant Riedel, and Defendant Cerbo that he was feeling depressed.

53.      Thereafter, the Plaintiff was seen by Defendant Riedel and Defendant Cerbo and while Defendant Cerbo recommended Fluoxetine hydrochloride (commonly marketed as Prozac), Defendant Riedel advised the Plaintiff that due to the Plaintiff's past negative reaction to Prozac that he would not place the Plaintiff on the medication. Defendant Riedel further advised the Plaintiff "you are not really depressed...you just dont want to deal with your problems."

54.      Thereafter, the Plaintiff met with Defendant Lugo and Defendant Cerbo, again, and was placed on Prozac by Defendant Riedel without further consultation.

55.      The Plaintiff was advised by Defendants Lugo, Carlton, and Toolin that he was being "well taken care of."

56.      However, the Defendants failed to properly administer the medication and monitor the Plaintiff. Specifically, the Defendants:

    a.      failed to monitor, or adequately supervise the nurse dispensing the medication, as routinely, the Plaintiff was taking a single dosage of Prozac as much as three times a day (60 mg), and was advised that if he missed medline (where medication was dispensed) he would be disciplined by Wyatt Staff. This was despite the fact that he was only suppose to take one dosage.

-19-

b.     On numerous occasions the Plaintiff attempted to advise Defendant Riedel, via a written Health Request, that the nurse was administering as much as triple the dosage (20 mg) that he had authorized, and such concerns were never responded to.

c.     Despite FDA warnings to the contrary, while the Plaintiff was on Prozac, he was also placed on a highly addictive benzodiazapine named Klonopin.

d.     The Plaintiff was also never advised, and the Defendants failed to properly detail and monitor the substantial risks associated with Prozac, and the very combination he was prescribed, despite being aware of such risks, and were reckless, by failing to observe that Prozac in some individuals actually increased the risk of suicide. Specifically, according to the FDA "Prozac and drugs like it...mak[e] healthy people with no history of mental health illness feel suicidal." A collective copy of the "Prozac May Encourage Suicide", May 22, 2000 BBC News, Prozac Linked to Child Risk Suicide", September 13, 2003 USA Today News, are attached hereto as Exhibit B.

e.     According to the FDA, Prozac "increased risks of suicidal thinking and behavior known as suicidality, in young adults ages 18 to 24 during initial treatment (generally the first one to two months)." Exhibit B, supra.

f.     The Defendants failed to monitor and address such concerns as the Plaintiff began exhibiting suicidality.

     (b)     The Incident

57.     On September 20, 2006, the Plaintiff, at approximately two (2) in the morning ingested a sharpened small paper clip and shortly thereafter began spitting up blood, and shaking uncontrollably.

58.     Inmate Cory Brown immediately notified Wyatt Staff, Defendant Lt. Mougenot, and Defendant Sgt. Doe 5.

59.     Defendant Lt. Mougenot, and Defendant Sgt. Doe 5 came and met the Plaintiff in A-Dorm, and inspected his clothes and bed sheets, which were stained with blood.

60.    Defendant Lt. Mougenot advised the Plaintiff "you fucking piece of shit...now you got to go to the hospital."

61.    Defendant Doe 5 advised the Plaintiff, "wait till you come back Turk...I am going to make your life hell."

62.    Thereafter, the Plaintiff was then taken to a local hospital by C.O. staff  and an x-ray revealed that a metal object was lodged in his stomach. The hospital medical staff advised the correctional officer staff and Defendant Lt. Mougenot and advised them of the results, and further advised the Plaintiff, that "you should be monitored for a few days until this object passes" and that "you should be on a liquid diet."

63.    Shortly thereafter, the Plaintiff was informed that Defendant Lt. Mougenot would "not authorize the Plaintiff being hospitalized" (i.e., being kept at the hospital). As a result, the Plaintiff was discharged shortly after 7 a.m., and was advised that the Wyatt staff should closely monitor the situation.

64.    Upon the Plaintiff's return to Wyatt, the Plaintiff was placed in segregation, denied a liquid diet and was not seen by the Wyatt medical doctor, Defendant Riedel. Instead, a Wyatt medical assistant took an x-ray of the Plaintiff's stomach and when the Plaintiff requested to see the doctor, he was advised, in part, "stop whining."

65.    Throughout the day on September 20, 2006, Plaintiff informed every officer and counselor on duty in segregation in B-Unit lockdown that he was in significant pain, and that he had not received any medical attention from the Wyatt doctor, Defendant Riedel. Plaintiff received no medical attention from the Wyatt

-21-

doctor on September 20, 2006.

66.     Throughout the day on September 21, 2006, Plaintiff informed every officer on duty in segregation in B-Unit lockdown and Defendant Lugo, Defendant Carlton, Defendant Singleton, Defendant Botello, Defendant Maureen, Defendant Riedel, and Defendant Buckless, as well as Sgt. Gomes that he was in excruciating pain, and that he had not received any medical attention from the Wyatt doctor, Defendant Riedel. Plaintiff received no medical attention from Defendant Riedel on September 21, 2006.

67.     On September 21, 2006, the Plaintiff was served with an incident report charging him with (a) self-mutilation and (b) conduct which disrupts.

68.     Throughout the day on September 21, 2006, the Defendants provided three (3) eight-ounce styrofoam cups to the Plaintiff to "spit up blood". At this time as a result of the September 20, 2006 incident, the Plaintiff was bleeding profusely.

69.     Throughout the day on September 22, 2006, Plaintiff informed every officer on duty in segregation in B-Unit lockdown and Defendant Lugo, Defendant Carlton, Defendant Singleton, Defendant Botello, Defendant Maureen, Defendant Riedel, and Defendant Buckless in writing, as well as Sgt. Gomes that he was in excruciating pain, and that he had not received any medical attention from the Wyatt doctor, Defendant Riedel. Plaintiff received no medical attention from Defendant Riedel on September 22, 2006.

70.     From September 20, 2006 through September 29, 2006, Plaintiff submitted seven (7) written requests for medical attention, some of which were submitted to and received by Defendant Lt. Mougenot. Only two (2) of those seven requests were forwarded to Wyatt medical staff, and all of those requests were ignored.

71.     Between September 20, 2006 and approximately September 27, 2006, Defendants Lugo and Botello visited the Plaintiff in B-Unit lockdown and observed that the Plaintiff had three cups filled with blood and continued to be bleeding and were informed by the Plaintiff that he was now bleeding when he went to the restroom. Nevertheless, the Plaintiff received no medical attention from Defendant Riedel during this time period.

72.     Between September 20, 2006 and approximately September 27, 2006, the Plaintiff also informed Defendant Lt. Mougenot and Defendant Sgt. Doe 5 of his condition and was advised, "you need to stop complaining if you want to get out of seg[regation]" by Sgt. Doe 5. Despite the Plaintiff's repeated requests for medical attention, none of the officers, counselors, or other employees of Cornell sought medical attention on his behalf.

73.     From September 20, 2006 through September 27, 2006, it was apparent that Plaintiff was seriously injured, in severe pain, and in need of immediate medical attention. Nevertheless, none of the officers, counselors, or other employees of Cornell sought medical attention on his behalf.

74.     From September 20, 2006 through September 27, 2006, Defendants Warden Synder, Associate Warden Doe 1, Singleton,

-23-

Lugo, Carlton, Toolin, Botello, and Riedel were repeatedly
contacted via telephone and letter by the Plaintiff's criminal
defense attorney of Bernard Grossberg; his father, Dr. Omer
B. Yalincak' his mother, Mrs. Ayfer Yalincak; his family
friends, Dr. Robert McKay; his immigration attorney of Edwin
T. Gania; and Nevzat Beyazid of the Turkish Consulate-New York
office. Nevertheless, none of the officers, counselors, or
other employees of Cornell sought medical attention on his
behalf.

        (c)     <u>Harm to Plaintiff</u>

75.   As a result of the Defendants' failure to provide
adequate medical treatment to the September 20, 2006 incident,
as described herein, the Plaintiff lost substantial amounts of
blood and was not able to eat solid foods, was not provided a
liquid diet or any other substitute, resulting in substantial
weight loss over the next one month period.

76.   As a result of the Defendants' deliberate indifference,
and reckless and callous indifference, in failing to provide
adequate medical    treatment, as described herein, Plaintiff
suffered, and continues to suffer, chronic and substantial physical
pain and impairment.

77.   As a result of the Defendants' deliberate indifference,
and reckless and callous indifference, in failing to provide
adequate medical treatment, as described herein, Plaintiff has
suffered serious emotional and mental harm.

78.   Defendant Salisbury, Defendant Doe 1, and Defendant
Riedel, as employees of Cornell, knew to a moral certainty that

they are charged with administering and providing inmates with Constitutionally adequate medical and mental health care.

79.     Defendant Salisbury, Defendant Doe 1, and Defendant Riedel knew that proper training and supervision of the nursing staff at Wyatt was necessary to adequately provide inmates with Constitutionally adequate medical and mental health care and were deliberately indifferent, grossly negligent, and acted with reckless disregard in administering medical health care to the Plaintiff in response to the September 20, 2006 incident with excessive risk to his health and safety, and such conduct was done without lawful justification and was designed to and did deprive Plaintiff of his rights guaranteed by the Eighth Amendment to the U.S. Constitution.

80.     The conduct of Defendants Salisbury, Defendant Doe 1, and Defendant Riedel in failing to provide adequate training and supervision to the Wyatt medical staff and correctional officers, and their failure to treat the Plaintiff, other than providing him styrofoam cups to spit up blood, as well as their failure to provide the Plaintiff with a replacement diet and review the Plaintiff's drug regimen as administered by the Wyatt medical staff involved reckless or callous indifference to Plaintiff's federally protected rights.

81.     The Defendants' organizations, systems, policies, procedures, practices, acts, and omissions all evidence and constitute cruel and unusual punishment in violation of the Eighth Amendment to the United States Constitution.

3.    <u>October 29, 2006 Incident</u>

(a)    <u>Background</u>

82.    In or about October 2006, the Plaintiff continued to be on the antidepressant Prozac, and his dosage of Klonopin, as a result of his continued anxiety, was increased by fifty percent (50%) (collectively with the Prozac, "the medication regimen").

83.    Throughout the month of October 2006, the Plaintiff's father, Dr. omer B. Yalincak, who is a medical doctor, and his mother, Ayfer Yalincak, and his attorney, Bernard M. Grossberg, repeatedly called Wyatt staff and advised them that the Plaintiff, since being put on the medication regimen, had increased suicidal tendencies, and had spoken of killing himself.

84.    On or about October 22, 2006, the Plaintiff immediately requested to see the psychologist, Defendant Cerbo, by delivering a Health Request to the medical staff, and advising every officer, counselor, Wyatt staff member, that he required immediate medical and/or mental health care.

85.    Thereafter, on October 29, 2006, the Plaintiff slashed his left forearm from his wrist to approximately his elbow with a regular razor and opened an 8.5" by 0.25" gash (hereinafter "the gash").

86.    Thereafter, the Plaintiff continued to seek someone to talk to and treated himself in the interim by wrapping the gash with paper towels, worn out socks, and worn out Wyatt issued underwear.

87.     Thereafter, the Plaintiff, yet again, placed more Health Request forms to the medical department at Wyatt.

88.     On Wednesday, November 1, 2006, the Plaintiff at approximately 6-7 p.m. was seen in medical by Defendant Cerbo. The Plaintiff showed Defendant Cerbo the gash, and advised him of his severe pain and suicidal tendency "over the past few weeks" and that he was afraid that he would be locked up in segregation and charged with self-mutilation. Defendant Cerbo stated that he would need to report the gash to the correctional officers on duty, and that if the Plaintiff advised them it was a habitual cut (i.e., "you are a cutter"), it would not be "serious punishment."

89.     Immediately thereafter, a Wyatt medical staff member removed the paper towels and clothing on the Plaintiff's arm, measured the gash to be 8.5" by 0.25". Subsequently, Defendant Maureen, upon seeing the Plaintiff's gash, treated the gash by applying gauze wrap to the Plaintiff's arm and stated "you jackass...look what you did."

90.     Thereafter, upon information and belief, the on-call sergeant was contacted, who in turn contacted Defendant Salisbury, Associate Warden Defendant Doe 1, Defendant Botello, Defendant Singleton, and Defendant Lugo.

91.     Thereafter, the Plaintiff was escorted by Wyatt staff to administrative segregation in B-Unit lockdown, charged with self-mutilation, and housed with another inmate named Keith Riedell.

-27-

92.    Despite repeated requests on November 1, 2006 by the Plaintiff, and despite his repeatedly informing the Defendants that he was in excruciating pain, the Plaintiff was never seen by the Wyatt medical doctor, Defendant John Riedell; the Plaintiff was not taken to an outside hospital for stitches despite profuse bleeding and the size of the gash; the Plaintiff was not given any antibiotic to protect him from infection given his open wound and, instead, was given a clear garbage bag to wrap around his gash for showers only; and the Plaintiff was not given any pain medication for his excruciating pain stemming from the 8.5" gash on his left forearm.

93.    Throughout November 2, 2006 through approximately November 11, 2006, the Plaintiff contacted his father, Dr. Omer B. Yalincak; his mother, Ayfer Yalincak; his sister, Hale Yalincak; his attorney, Bernard M. Grossberg; his parents attorneys, Edwin T. Gania, Robert A. Byers, and Gordon Mehler; and Nevzat Beyazid of the Turkish Consulate-New York office searching for help. In turn, each of these individuals placed a total of forty (40) calls to Wyatt staff, including but not limited to, Defendant John Riedel, Defendant Luis A. Cerbo, Defendant Warden Salisbury, Defendant Associate Warden Doe 1, Defendant Jean Singleton, Defendant Linda Lugo. Defendant June M. Carlton, Defendant Patrick Toolin, and Defendant Captain Frank Botello.

94.    In addition, the Plaintiff submitted twenty-one (21) written Health Requests and/or letters requesting treatment for his gash, and requesting that he be released from administrative

-28-

segregation to Wyatt staff, some of which were received by
Defendant Warden Salisbury, Defendant Associate Warden Doe 1,
Defendant Singleton, Defendant Carlton, Defendant Toolin,
Defendant Botello, Defendant Buckless, Defendant Morales,
Defendant Falcon, Defendant Sgt. Gomes, Defendant Lt. Mougenot,
and Defendant Sgt. Doe 5. Nevertheless, none of the officers,
counselors, or other employees of Cornell sought medical
attention on his behalf and none of his numerous letters or written
requests received a written response and were ignored.

95.    As a result of the substantial number of grievances,
letters and requests placed by the Plaintiff, as well as the
Plaintiff's family, friends, and attorneys, the Plaintiff upon
being released from segregation on or about November 11, 2006
was seen by Defendants Lugo and Botello and was advised that
"until you get your people [family] to stop calling us you are
not going to get your legal work back or go back to A-Dorm."

96.    Upon being moved to C-Unit, the Plaintiff continued
to submit written requests to the Defendants, requesting that he
be taken to an outside hospital for treatment, and that he be
treated for his excruciating pain.

97.    In addition, the Plaintiff informed his C-Unit
counselor, who was also the grievance coordinator, Defendant
Patrick Toolin, as well as Defendant Warden Salisbury, Defendant
Associate Warden Doe 1, Defendant Singleton, Defendant Lugo,
Defendant Carlton(his prevous A-Dorm Counselor), Defendant Botello,
Defendant Nurse Maureen, Defendant Riedel, Defendant Cerbo,
Defendant Lt. Mougenot, and Defendant Doe 5 of the very unsanitary

-29-

conditions at C-Unit:  <u>wide spread excrement-sewage-</u> in the C-Unit dayroom (where everyone in the unit eats), as a result of plumbing problems in connection with construction at Wyatt. This would occur once a day, whenever anyone flushed in the Unit, and the sewage had built up, and would then flood the C-Unit dayroom, and routinely the cells, such as the Plaintiff's which was located on the bottom tier. This sewage was then subsequently cleaned up by pod orderlies with a mop--by pushing the sewage water back into the drains. There was no disinfectant or other materials provided, and despite the Plaintiff having a large, open gash on his arm, he was forced to clean the C-Unit sewage out of the  dayroom and out of his own cell, so at the very least, he can eat. The daily flooding continued for 30 days.

98.    Between November 11, 2006 and December 20, 2006, the Plaintiff remained in excruciating pain and developed an infection in his open gash.

99.    Between November 11, 2006 and December 20, 2006, when the Plaintiff complained of the conditions in C-Unit, and his own medical conditions to Defendant C.O. Morales, Defendant Buckless, Defendant Lt. Mougenot, and Defendant Sgt. Doe 5, the C-Unit officers who were on duty, the Plaintiff was advised by C.O. Buckless "you think this prison is bad...you ever see what happened in Midnight Express [a movie about a Turkish prison]". The Plaintiff was advised by Defendant Lt. Mougenot and Defendant Sgt. Doe 5 to "stop the fucking whining" and was denied access for two (2) weeks to his own legal materials.

-30-

100.    Between November 11, 2006 and December 20, 2006,
the Plaintiff's family, friends, and all of the attorneys
listed previously, repeatedly contacted the Wyatt staff, and
as a result the Plaintiff was called into Defendant Toolin's
office on at least three (3) occasions where Defendants Lugo,
Singleton, Carlton, Botello, Toolin, and Sgt. Gomes told
the Plaintiff to "tell your family to stop calling us" and
Defendant Lugo, for example, played a tape recording of the
Plaintiff's sister and father's voicemail, and again,
reiterated that the Plaintiff's family and attorneys should
stop calling. Additionally, the Defendants informed the Plaintiff
that Defendant Warden Salisbury "concurred" in their advice.
Despite the Plaintiff's continued request for medical attention
for his gash, such as stitches and antibiotics, so scarring
would be minimized and antibiotics to treat his infection,
the Defendants ignored the Plaintiff's request.

101.    In addition, the Plaintiff was advised
by Wyatt medical personnel when he showed his gash to a
medline worker, and requested assistance with the pus that
was starting to ooze out of his arm, that he would "just have
to suffer" by Defendant C.O. Morales.

102.    During the time period of November 1, 2006 through
December 20, 2006, the Plaintiff was never seen by the Wyatt medical
doctor, Defendant Riedel.

103.    During the time period of November 1, 2006, the
date the gash was first discovered by Defendant Cerbo, till the
date he was released on bail pending sentence by the sentencing court

-31-

on January 5, 2007 to receive treatment and counseling, the
Plaintiff was, not once, seen by the Wyatt medical doctor,
Defendant John Riedel, for his gash or infection.

104.     From October 29, 2006 to January 5, 2007, it
was apparent that Plaintiff was seriously injured, in severe
pain, and in need of immediate medical attention. Nevertheless,
none of the Cornell staff who had contact with Plaintiff sought
medical attention on his behalf.

(b)     Harm to Plaintiff

105.     As a result of the Defendants' failure to provide
adequate medical treatment to the October 29, 2006 incident,
as described herein, it caused the Plaintiff substantial blood
loss, a permanent 8.5" scar on his left forearm, and other
significant injury.

106.     As a result of the Defendants' deliberate
indifference, reckless and callous indifference in failing to
provide adequate medical treatment, as described herein,
Plaintiff suffered and continues to suffer, chronic and
substantial physical pain and physical impairment in his left arm.

107.     As a result of the Defendants' deliberate
indifference, reckless and callous indifference in failing to
provide Constitutionally adequate treatment, as described herein,
Plaintiff has suffered serious emotional and mental harm including
flashbacks and nightmares.

108.     Defendant Salisbury, Defendant Doe 1, and Defendant
Riedel, as employees of Cornell, knew to a moral certainty that
they are charged with administering and providing inmates with
Constitutionally adequate medical and mental health care.

-32-

109.     Defendant Salisbury, Defendant Doe 1, and Defendant Riedel knew that proper training and supervision of the nursing staff at Wyatt was necessary to adequately provide inmates with Constitutionally adequate medical and mental health care and were deliberately indifferent, grossly negligent, and acted with reckless disregard in administering medical health care to the Plaintiff in response to the October 29, 2006 incident with excessive risk to his health and safety, and such conduct was done without lawful justification and was designed to and did deprive Plaintiff of his rights guaranteed by the Eighth Amendment to the U.S. Constitution.

110.     The conduct of Defendants Salisbury, Defendant Doe 1, and Defendant Riedel in failing to provide adequate training and supervision to the Wyatt medical staff and correctional officers, and their failure to treat the Plaintiff, other than providing the Plaintiff with gauze for his gash, despite his repeated requests that he be taken to a hospital to receive stitches and be placed on antibiotics, involved reckless or callous indifference to Plaintiff's federally protected rights.

111.     The Defendants' organizations, systems, policies, procedures, practices, acts, and omissions all evidence and constitute cruel and unusual punishment in violation of the Eighth Amendment to the United States Constitution.

112.     The actions of the Defendants, as described herein, involved evil motive or intent, and caused the Defendant irreperable physical and emotional harm.

113.     On or about January 5, 2007, the Plaintiff was released from Wyatt and continues to the present to suffer substantial physical and mental harm.

## CLAIMS FOR RELIEF

### First Claim for Relief

### (Constitutional Violations-Cornell)

114.     Paragraphs 1 through 113, above, are repeated and realleged as if fully set forth herein.

115.     Defendant Cornell employs all of the individual Defendants named herein.

116.     Because it has undertaken the government's Constitutional duty to provide adequate medical and mental health care to prisoners in its custody, Defendant Cornell was and is a government actor with respect to all its actions and omissions complained of herein.

117.     Defendant Cornell's deliberate indifference to Plaintiff's serious medical and mental health needs has caused and continues to cause avoidable pain, mental suffering, and deterioration of Plaintiff's health, resulting in the unnecessary and wanton infliction of pain on Plaintiff, and depriving Plaintiff of his right to be free from cruel and unusual punishment guaranteed by the Eighth Amendment to the United States Constitution.

118.     Defendant Cornell's actions, as described herein, was motivated by evil motive or intent, or involved reckless and callous indiffference to Plaintiff's federally protected rights.

-34-

119.     As a proximate result of Defendant Cornell's organizations, systems, policies, procedures, practices, acts, and omissions at Wyatt, the Plaintiff was deprived of his right to be free from cruel and unusual punishment guaranteed by the Eighth Amendment to the United States Constitution.

120.     Defendant Cornell was aware of the organizations, systems, policies, procedures, practices, acts, and omissions at Wyatt, had a realistic opportunity to prevent the medical and mental harm to Plaintiff, and yet failed to prevent the serious medical and mental harm caused to the Plaintiff, thereby depriving the Plaintiff of his right to be free from cruel and unusual punishment guaranteed by the Eighth Amendment to the United States Constitution.

121.     As a direct and proximate result of Defendant Cornell's actions and omissions complained of herein, Plaintiff suffered significant injury, including serious physical harm, excruciating pain, and emotional distress, entitling Plaintiff to damages in an amount to be determined at trial. In addition, Plaintiff is entitled to punitive damages.

### Second Claim for Relief

### (Constitutional Violations-Defendant Cornell, Defendant Warden Salisbury, Defendant Associate Warden Doe 1, Defendant Riedel, And Defendant Cerbo)

122.     Paragraphs 1 through 121, above, are repeated and realleged as if fully set forth herein.

123.     Defendant Cornell, Defendant Warden Salisbury, Defendant Associate Warden Doe 1, Defendant Riedel, and Defendant Cerbo, as operators of Wyatt, and employees of Cornell, knew

to a moral certainty that they were charged with administering
and providing the Plaintiff with Constitutionally adequate
medical and mental health care.

124.    Defendant Warden Salisbury, Defendant Associate
Warden Doe 1, Defendant Riedel, and Defendant Cerbo, by virtue
of their employment by Defendant Cornell, and as operators of
Wyatt, were acting under color of federal law.

125.    Defendant Cornell, Defendant Warden Salisbury,
Defendant Associate Warden Doe 1, Defendant Riedel, and
Defendant Cerbo's deliberate indifference to Plaintiff's
serious medical and mental health needs has caused and
continues to cause avoidable pain, mental suffering, and
deterioration of Plaintiff's health, resulting in the unnecessary
and wanton infliction of pain on Plaintiff, and depriving
Plaintiff of his right to be free from cruel and unusual
punishment guaranteed by the Eighth Amendment to the United
States Constitution.

126.    Defendant Cornell, Defendant Warden Salisbury,
Defendant Associate Warden Doe 1, Defendant Riedel, and Defendant
Cerbo's actions, as described herein, were motivated by evil
motive or intent, or involved reckless and callous indifference
to Plaintiff's federally protected rights.

127.    Defendant Cornell, Defendant Warden Salisbury,
Defendant Associate Warden Doe 1, Defendant Riedel, and Defendant
Cerbo knew that proper training, staffing, and supervision of
the nursing staff, medical staff, and correctional officers

-36-

was necessary to adequately provide inmates with Constitutionally adequate medical and mental health care and were deliberately indifferent, grossly negligent, and acted with reckless disregard in administering medical health care to the Plaintiff in response to the November 21, 2005, September 20, 2006, and October 29, 2006 incidents with excessive risk to his health and safety, and such conduct was done without lawful justification and was designed to and did deprive Plaintiff of his rights guaranteed by the Eighth Amendment to the United States Constitution.

128.    Defendant Cornell, Defendant Warden Salisbury, Defendant Associate Warden Doe 1, and Defendant Cerbo were aware of the organizations, systems, policies, procedures, practices, acts, and omissions at Wyatt, had a realistic opportunity to prevent the serious medical and mental harm caused to the Plaintiff, thereby depriving Plaintiff of his right to be free from cruel and unusual punishment guaranteed by the Eighth Amendment to the United States Constitution.

129.    As a proximate result of Defendant Cornell's organizations, systems, policies, procedures, practices, acts, and omissions at Wyatt, the Plaintiff was deprived of his right to be free from cruel and unusual punishment guaranteed by the Eighth Amendment to the United States Constitution.

130.    As a direct and proximate result of Defendant Cornell's actions and omissions complained of herein, Plaintiff suffered significant injury, including serious physical harm, excruciating pain, and emotional distress, entitling Plaintiff

to damages in an amount to be determined at trial. In addition,
Plaintiff is entitled to punitive damages.

### Third Claim for Relief

**(Constitutional Violations-Defendant Cornell, Defendant Singleton,
Lugo, Carlton, Toolin, Botello, Sgt. Gomes, Lt. Mougenot,
And Sgt. Doe 5)**

131.    Paragraphs 1 through 130, above, are repeated
and realleged as if fully set forth herein.

132.    Defendant Cornell, Defendant Singleton, Defendant
Lugo, Defendant Carlton, Defendant Toolin, Defendant Botello,
Defendant Sgt. Gomes, Defendant Lt. Mougenot, and Defendant
Sgt. Doe 5, as operators of Wyatt, and employees of Cornell,
knew to a moral certainty that they were charged with
administering and providing the Plaintiff with Constitutionally
adequate medical and mental health care.

133.    Defendant Cornell, Defendant Singleton, Defendant
Lugo, Defendant Carlton, Defendant Toolin, Defendant Botello,
Defendant Sgt. Gomes, Defendant Lt. Mougenot, and Defendant
Sgt. Doe 5, by virtue of their employment by Defendant Cornell,
and as operators of Wyatt, were acting under color of federal
law.

134.    Defendant Cornell, Defendant Singleton, Defendant
Lugo, Defendant Carlton, Defendant Toolin, Defendant Botello,
Defendant Sgt. Gomes, Defendant Lt. Mougenot, and Defendant
Sgt. Doe 5, by virtue of their employment by Defendant Cornell,
and as operators of Wyatt, were deliberately indifferent to
Plaintiff's serious medical and mental health needs, which caused

-38-

the Plaintiff, and continues to cause avoidable pain, mental
suffering, and deterioration of Plaintiff's health, resulting
in the unnecessary and wanton infliction of pain on
Plaintiff, and depriving Plaintiff of his right to be free
from cruel and unusual punishment guaranteed by the Eighth
Amendment to the United States Constitution.

135.    Defendant Cornell, Defendant Singleton, Defendant
Lugo, Defendant Carlton, Defendant Toolin, Defendant Botello,
Defendant Sgt. Gomes, Defendant Lt. Mougenot, and Defendant
Sgt. Doe 5, as described herein, were motivated by evil motive
or intent, or involved reckless and callous indifference to
Plaintiff's federally protected rights.

136.    Defendant Cornell, Defendant Singleton, Defendant
Lugo, Defendant Carlton, Defendant Toolin, Defendant Botello,
Defendant Sgt. Gomes, Defendant Lt. Mougenot, and Defendant
Sgt. Doe 5 knew that proper training, staffing, and supervision
of the correctional officers, counselors, nursing staff, and
medical staff, was necessary to adequately provide inmates with
Constitutionally adequate medical and mental health care and
were deliberately indifferent, grossly negligent, and acted
with reckless disregard in administering medical and mental
health care to the Plaintiff in response to the November 21,
2005, September 20, 2006, and October 29, 2006 incidents with
excessive risk to his health and safety, and such conduct was
done without lawful justification and was designed to and did
deprive Plaintiff of his rights guaranteed by the Eighth
Amendment to the U.S. Constitution.

137.    Defendant Cornell, Defendant Singleton, Defendant Lugo, Defendant Carlton, Defendant Toolin, Defendant Botello, Defendant Sgt. Gomes, Defendant Lt. Mougenot, and Defendant Sgt. Doe 5 were aware of the organizations, systems, policies, procedures, practices, acts, and omissions at Wyatt, had a realistic opportunity to prevent the serious medical and mental harm caused to the Plaintiff, thereby depriving Plaintiff of his right to be free from cruel and unusual punishment guaranteed by the Eighth Amendment to the United States Constitution.

138.    As a proximate result of Defendant Cornell, Defendant Lugo, Defendant Carlton, Defendant Toolin, Defendant Botello, Defendant Sgt. Gomes, Defendant Lt. Mougenot, and Defendant Sgt. Doe 5's organizations, systems, policies, procedures, practices, acts, and omissions at Wyatt, the Plaintiff was deprived of his right to be free from cruel and unusual punishment guaranted by the Eighth Amendment to the United States Constitution.

139.    As a direct and proximate result of Defendant Cornell, Defendant Lugo, Defendant Carlton, Toolin, Defendant Botello, Defendant Sgt. Gomes, Defendant Lt. Mougenot, and Defendant Sgt. Doe 5's actions and omissions complained of herein, Plaintiff suffered significant injury, including serious physical harm, excruciating pain, and emotional distress, entitling Plaintiff to damages in an amount to be determined at trial. In addition, Plaintiff is entitled to punitive damages.

Fourth Claim for Relief

(Constitutional Violations-Defendant Cornell, Defendant Buckless, Defendant Falcon, Defendant Morales, Defendant Nurse Maureen, And Defendant Nurse Lisa)

140.     Paragraphs 1 through 139, above, are repeated and realleged as if fully set forth herein.

141.     Defendant Cornell, Defendant C.O. Buckless, Defendant C.O. Falcon, Defendant C.O. Morales, Defendant Nurse Maureen, and Defendant Nurse Lisa, as operators of Wyatt, and employees of Cornell, knew to a moral certainty that they were charged with administering and providing the Plaintiff with Constitutionally adequate medical and mental health care.

142.     Defendant Cornell, Defendant C.O. Buckless, Defendant C.O. Falcon, Defendant C.O. Morales, Defendant Nurse Maureen, and Defendant Nurse Lisa, by virtue of their employment by Defendant Cornell and as operators of Wyatt, were acting under color of federal law.

143.     Defendant Cornell, Defendant   C.O. Buckless, Defendant C.O. Falcon, Defendant C.O. Morales, Defendant Nurse Maureen, and Defendant Nurse Lisa, were deliberately indifferent to Plaintiff's serious medical and mental health needs, which caused the Plaintiff, and continues to cause the Plaintiff avoidable pain, mental suffering, and deterioration of Plaintiff's health, resulting in the unnecessary and wanton infliction of pain on Plaintiff, and depriving Plaintiff of his right to be free from cruel and unusual punishment guaranteed by the Eighth Amendment to the United States Constitution.

the Plaintiff, and continues to cause the Plaintiff avoidable
pain, mental suffering, and deterioration of Plaintiff's health,
resulting in the unnecessary and wanton infliction of pain on
Plaintiff, and depriving Plaintiff of his right to be free from
cruel and unusual punishment guaranteed by the Eighth Amendment
to the United States Constitution.

144.    Defendant Cornell, Defendant C.O. Buckless,
Defendant C.O. Falcon, Defendant C.O. Morales, Defendant Nurse
Maureen, and Defendant Nurse Lisa, were deliberately indifferent
to Plaintiff's serious medical and mental health needs, as
described herein, were motivated by evil motive or intent,
or involved reckless and callous indifference to Plaintiff's
federally protected rights.

145.    Defendant Cornell, Defendant C.O. Buckless,
Defendant C.O. Falcon, Defendant C.O. Morales, Defendant
Nurse Maureen, and Defendant Lisa, were deliberately indifferent,
grossly negligent, and acted with reckless disregard in
administering medical and mental health care to the Plaintiff
in response to the November 21, 2005, September 20, 2006, and
October 29, 2006 incidents with excessive risk to his health
and safety, and such conduct was done without lawful
justification and was designed to and did deprive Plaintiff
of his rights guaranteed by the Eighth Amendment to the U.S.
Constitution.

146.    Defendant Cornell, Defendant C.O. Buckless,
Defendant C.O. Falcon, Defendant C.O. Morales, Defendant Nurse
Maureen, and Defendant Nurse Lisa, were aware of the organizations,

-42-

systems, policies, procedures, practices, acts, and omissions at Wyatt, had a realistic opportunity to prevent the serious medical and mental harm caused to the Plaintiff, thereby depriving Plaintiff of his right to be free from cruel and unusual punishment guaranteed by the Eighth Amendment to the United States Constitution.

147.    As a proximate result of Defendant Cornell, Defendant Buckless, Defendant C.O. Falcon, Defendant C.O. Morales, Defendant Nurse Maureen, and Defendant Nurse Lisa's organizations, systems, policies, procedures, practices, acts, and omissions at Wyatt, the Plaintiff was deprived of his right to be free from cruel and unusual punishment guaranteed by the Eighth Amendment to the United States Constitution.

148.    As a direct and proximate result of Defendant Cornell, Defendant Buckless, Defendant C.O. Falcon, Defendant C.O. Morales, Defendant Nurse Maureen, and Defendant Nurse Lisa's actions and omissions complained of herein, Plaintiff suffered significant injury, including serious physical harm, excruciating pain, and emotional distress, entitling Plaintiff to damages in an amount to be determined at trial. In addition, Plaintiff is entitled to punitive damages.

### Fifth Claim for Relief

### (Negligence--As to All Defendants)

149.    Paragraphs 1 through 148, above, are repeated and realleged as if fully set forth herein.

-43-

150.     Because of the custodial relationship between
Cornell and Wyatt prisoners, persons incarcerated at Wyatt
were and are entirely dependent on Cornell for medical and
mental health care. As a consequence of the custodial
relationship, and by virtue of Cornell's explicit contractual
duty to provide medical care to inmates that was commensurate
with the well-established standards of care in the community,
within the broader correctional industry, and under federal
law, Cornell has a duty to provide reasonable medical and
mental health care to the prisoners at Wyatt. Therefore,
Cornell owed Plaintiff a duty of care while Plaintiff was
incarcerated at Wyatt between June 16, 2005 and January 5, 2007.

151.     By virtue of his position as Warden, Defendant
Salisbury owed Plaintiff a duty of care.

152.     By virtue of his position as Assistant Warden,
Defendant Doe 1 owed Plaintiff a duty of care.

153.     By virtue of her position as the Senior Counselor
and Program Administrator, Defendant Singleton owed Plaintiff
a duty of care.

154.     By virtue of her position as the Senior Counselor
and Program Administrator, Defendant Lugo owed Plaintiff a
duty of care.

155.     By virtue of his position as the Counselor for
C-Unit (where, for a time the Plaintiff was held), and as
Wyatt Grievance Coordinator, Defendant Toolin owed Plaintiff a
duty of care.

156.     By virtue of her position as the Counselor for
A-Dorm and B-Unit lockdown (where, for a time, the Plaintiff was

-44-

held), Defendant Carlton owed Plaintiff a duty of care.

157.    By virtue of his position as Captaion, and later Major, Defendant Botello owed Plaintiff a duty of care.

158.    By virtue of her position as a correctional officer, Defendant Falcon owed Plaintiff a duty of care.

159.    By virtue of her position as a correctional officer, Defendant Morales owed Plaintiff a duty of care.

160.    By virtue of his position as Sergeant, Defendant Gomes owed Plaintiff a duty of care.

161.    By virtue of her position as a nurse in the medical department who was responsible for the Plaintiff's medical and mental health treatment, Defendant Nurse Maureen owed Plaintiff a duty of care.

162.    By virtue of her position as a nurse in the medical department who was responsible for the Plaintiff's medical and mental health treatment, Defendant Nurse Lisa owed Plaintiff a duty of care.

163.    By virtue of his position as psychologist in the medical department who was responsible for the Plaintiff's medical and mental health care, Defendant Dr. Cerbo owed Plaintiff a duty of care.

164.    By virtue of his position as the medical doctor in the Wyatt medical department who was responsible for the Plaintiff's medical and mental health care, Defendant Riedel owed Plaintiff a duty of care.

165.    By virtue of his position as Lieutenant, Defendant Lieutenant Mougenot owed the Plaintiff a duty of care.

166.    By virtue of his position as Sergeant, Defendant Doe 5 owed the Plaintiff a duty of care.

167.    Through its organizations, systems, policies, practices, institutional conditions, acts, and omissions, Cornell deprived the Plaintiff of adequate medical and mental health care, all in breach of its duty of care to the Plaintiff. Cornell's acts and omissions constitute a breach of the standard of care owed by a reasonably prudent person in similar circumstances.  Defendant Cornell's breaches include but are in no way limited to:  (a)  negligence in the hiring, training, supervision and retention of competent employees; (b)  the failure to maintain an adequate level of qualified health care staff at Wyatt (i.e., Wyatt did not have a licensed psychiatrist); (c)  the failure to monitor the actions and practices of health care staff; (d)  the failure to oversee the treatment prescribed and administered by health care staff; (e)  the failure to establish an adequate and reasonable method for distributing medication; (f)  the failure to maintain adequate and reasonable policies and procedures governing prisoners' timely access to medical care; (g)  the failure to provide timely medical, physical, and/or mental health counseling or therapy; (h)  the failure to maintain adequate medicines and/or medical supplies and equipment; and (i)  the failure to comply with numerous other statutory, regulartory, contractual, governmental, and industry standards

with respect to the provision of medical, and mental health care in correctional facilities.

168.     As a direct and proximate result of Defendant Cornell's acts and omissions in breach of Cornell's duty of care, Plaintiff suffered significant injury, including serious physical harm,  excruciating pain, and emotional suffering, and heightened risk of premature death, entitling Plaintiff to damages in an amount to be determined at trial. Cornell's conduct was a substantial factor in bringing about such harms, and a person of ordinary prudence could have reasonably foreseen that such harms would result. In addition, Plaintiff is entitled to punitive damages.

169.     The Individual Defendants are all employed by Defendant Cornell, and as correctional officers, counselors, Warden, Associate Warden, Lieutenant, Sergeant, and medical personnel, collectively and individually owed the Plaintiff a duty of care.

170.     The Individual Defendants' failure to seek immediate medical attention, and failure to provide adequate medical and mental health care, for Plaintiff's serious injuries breached the duty of care owed by those Defendants to Plaintiff.

171.     The Individual Defendants' failure to seek immediate medical attention, and failure to provide adequate medical and mental health care, for Plaintiff's serious injuries breached the duty of care owed by those Defendants to Plaintiff and took place while those defendants were acting within the scope of their employment.

172.    The Individual Defendants' failure to seek
immediate medical attention for Plaintif's serious injuries
was not based on any policy considerations.

173.    As a direct result of the Individual Defendants'
inaction, Plaintiff suffered significant injury, including
serious harm, excruciating pain and emotional distress,
entitling Plaintiff to damages in an amount to be determined
at trial. In addition, Plaintiff is entitled to punitive
damages.

### Sixth Claim for Relief

### (Medical Malpractice--Defendant Cornell, Defendant Riedel, Defendant Cerbo)

174.    Paragraphs 1 through 173, above, are repeated
and realleged as if fully set forth herein.

175.    Because of the custodial relationship between
Cornell and Wyatt prisoners, persons incarcerated at Wyatt
were and are entirely dependent on Cornell, and its employees,
for medical and mental health care. As a consequence of the
custodial relationship, and by virtue of Cornell's explicit
contractual duty to provide medical care to inmates that
was commensurate with the well-established standards of care
in the community, within the broader correctional industry,
and under federal law, Cornell, and Defendant Riedel and
Defendant Cerbo were part of a doctor-client relationship.

176.    As a direct and proximate result of Defendant
Cornell's and Defendant Riedel and Defendant Cerbo's acts and
omissions, as complained of herein, the Plaintiff suffered
significant injury, including serious physical harm, excruciating

-48-

pain, and emotional suffering, and this constituted a failure
of one rendering professional services to exercise that degree
of skill and learning commonly applied under all the circumstances
in the community by the average prudent reputable member of the
profession and resulted in injury to the Plaintiff.

177.    As a direct and proximate result of the Defendant
Cornell, Defendant Riedel, and Defendant Cerbo's actions,
as complained of herein, Plaintiff suffered significant injury,
including serious harm, excruciating pain and emotional
distress, entitling Plaintiff to damages in an amount to be
determined at trial. In addition, Plaintiff is entitled to punitive
damages.

<u>Seventh Claim for Relief</u>

<u>(Intentional Infliction of Emotional Distress--As to All
Defendants)</u>

178.    Paragraphs 1 through 177, above, are repeated
and realleged as if fully set forth herein.

179.    The Defendants herein intended to inflict
emotional distress by virtue of their acts and omissions, as
complained of herein, or in the alternative, the Defendants knew
or should have known that emotional distress was the likely result
of their conduct.

180.    The conduct, as complained of herein, was extreme
and outrageous and surpassed all bounds tolerated by a civilized
society.

181.    As a direct result of the Defendants acts or
omissions, as complained of herein, Plaintiff sufferd significant

injury, including serious harm, excruciating pain and emotional distress, entitling Plaintiff to damages in an amount to be determined at trial. In addition, Plaintiff is entitled to punitive damages.

### Eighth Claim for Relief

### (Negligent Infliction of Emotional Distress--As to All Defendants)

182.     Paragraphs 1 through 181, above, are repeated and realleged as if fully set forth herein.

183.     The allegations contained in the Seventh Claim for Relief, supra, in the alternative, constitute Negligent Infliction of Emotional Distress, if not Intentional Infliction of Emotional Distress.

184.     The Defendants should have realized that their conduct involved an unreasonable risk of causing emotional distress, if it were caused, might result in illness or bodily harm.

185.     As a result of the foregoing, the Plaintiff has suffered an ascertainable loss.

### PRAYERS FOR RELIEF

WHEREFORE,     Plaintiff prays that this Cour enter judgment on his complaint in his favor and against the Defendants:

a.     Awarding compensatory damages in an amount to be determined at trial;

b.     Awarding punitive damages in an amount to be determined at trial;

c.     Awarding pre- and post judgment interest;

d.     Awarding costs, expenses, and reasonable attorneys' fees; and

e.    Ordering such other relief as this Court deems
just and proper.

## Jury Demand

Pursuant to Federal Rules of Civil Procedure ("Fed.R.Civ.P.")
Rule 38, the Plaintiff demands a trial by jury on all issues
so triable.

February 14, 2008                    Respectfully submitted,

                                     _____
                                     Hakan Yalincak Pro Se
                                     Reg. No. 15662-014
                                     Rivers Correctional Institution
                                     P.O. Box 630
                                     Winton, NC 27986
                                     (252) 358-5200 Tel.
                                     (617) 737-8223 Fax.


I declare under penalty of perjury that the foregoing is true
and correct.

February 14, 2008

                                     _____
                                     Hakan Yalincak