UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF RHODE ISLAND

| | |
|---|---|
| HAKAN YALINCAK,<br><br>Plaintiff,<br><br>v.<br><br>CORNELL COMPANIES, INC.; CORNELL CORRECTIONS OF RHODE ISLAND, INC.; CENTRAL FALLS DETENTION FACILITY CORP.; WARDEN WAYNE T. SALISBURY, JR.; ASSOCIATE WARDEN JOHN DOE 1; JEAN SINGLETON; LINDA LUGO; JUNE M. CARLTON; PATRICK TOOLIN; FRANK BOTELLO; JOHN DOE 2 A/K/A "C.O. BUCKLESS"; JANE DOE 1 A/K/A "C.O. FALCON"; JANE DOE 2 A/K/A "C.O. MORALES"; JOHN DOE 3 A/K/A "SGT. GOMES"; JANE DOE 3 "NURSE MAUREEN"; JANE DOE 4 A/K/A "NURSE LISA"; LUIS A. CERBO; JOHN RIEDEL; JOHN DOE 4 A/K/A "LT. MOUGENOT"; AND JOHN DOE 5 A/K/A "SGT. DOE 5";<br><br>Defendants. | CASE NO. 1:08-CV-00057-S-JH<br><br>MAY 28, 2008 |

**AMENDED COMPLAINT AND JURY DEMAND**

Plaintiff, Hakan Yalincak, appearing Pro Se, as and for his Amended Complaint, alleges upon personal knowledge the following:

**PRELIMINARY STATEMENT**

1. The Plaintiff, Hakan Yalincak (hereinafter the "Plaintiff" or "Mr. Yalincak"), brings this lawsuit as a result of the grossly inadequate and inhumane level of medical care he received while he was incarcerated at the Donald W. Wyatt Detention Facility ("Wyatt"), as a detainee from June 6, 2005 to on or about January 5, 2007. The inhumane and unconstitutional system of health care at

Wyatt is the direct cause of the permanent physical damage and profound mental and physical pain sustained by the Plaintiff.

2. Wyatt is a correctional facility owned by the Central Falls Detention Facility ("CFDF"), a public corporation controlled by the City of Central Falls, and operated by Cornell Correction of Rhode Island, Inc. ("CCRI"), a private corporation controlled by Defendant Cornell Companies, Inc. ("Cornell"). Upon information and belief, specifically Cornell's 2006 Annual Report filed with the Securities and Exchange Commission ("SEC"), Cornell's primary clients are the U.S. Marshals Service ("USM"), the Federal Bureau of Prisons ("BOP"), and Immigration And Customs Enforcement ("ICE") division of the Department of Homeland Security ("DHS") (collectively, the "DOJ") pursuant to a written contract with the respective DOJ Agencies. Presently, Cornell houses more than 1,000 pretrial detainees and immigration detainees at Wyatt, most from the State of Connecticut, State of Rhode Island, and State of Massachusetts. During the Plaintiff's pretrial detention at Wyatt, the facility had a capacity of 357 beds and housed between 300-400 inmates. The new additions in inmates are as a result of new expansions by the facility during calendar year 2007 to include women and other detainees.

3. The health care system at the Wyatt facility is broken. Medical professional staffing levels at Wyatt are grossly inadequte. Defendants routinely refuse to provide prisoners at Wyatt with treatment for their serious chronic medical conditions. When prisoners arrive at Wyatt, Defendants routinely and arbitrarily switch and discontinue drug regimens that were carefully developed

and calibrated by medical professionals, without consultation with the affected patients and without regard to the negative therapeutic consequences. Wyatt provides no physical therapy; its personnel simply disregard explicit instructions in medical records to provide this treatment. Serious mental health needs, even in cases of attempted, or completed suicide, are routinely ignored.

4. By allowing this broken medical system to continue as detailed in this Complaint, the Defendants have permanently harmed the Plaintiff, and many other prisoners at Wyatt; have precipated and otherwise avoidable acute medical crises such as MRSA; have caused many men at Wyatt to experience chronic and debilitating pain and suffering; and have contributed to the needless disfigurement, and serious physical injury of the Plaintiff and others at Wyatt.

5. Prisoners incarcerated at Wyatt depend wholly upon their custodians to provide Constitutionally adequate care. Wyatt has also specifically agreed in its contract with the respective DOJ Agencies that it will provide the Plaintiff, and all prisoners housed at Wyatt, with medical services that are commensurate with community standards. Defendants' generally applicable policies, guidelines, and practices have all contributed to Wyatt's failure to respond adequately to the Plaintiff and other prisoners' serious medical needs. Through these unlawful policies and practices, Defendants manifested a pervasive and deliberate indifference to the medical, and mental health needs of the Plaintiff. As a result Defendants knowingly and willfully denied the Plaintiff, while he

was incarcerated at Wyat, his right to adequate medical care in violation of the U.S. Constitution, federal law, common law, and contract.

6. Upon information and belief, the deficiencies and deprivations described above and detailed in the Complaint are the result of Defendant Cornell's aggressive efforts to cut costs and boost profits, and its glaring failure to ensure that its employees fulfill the federal and state duty Cornell has undertaken to provide.

7. As a result of the physical and mental injuries sustained by the Plaintiff as a direct result of the Defendants conduct, the Plaintiff seeks relief from this Court.

**PARTIES**

8. Plaintiff, Hakan Yalincak (the "Plaintiff" or "Mr. Yalincak"), is a 23-year old Turkish citizen, and a resident of the State of Connecticut, who was incarcerated at Wyatt between June 16, 2005 and January 5, 2007 as a pretrial, and subsequently post-trial detainee. This was Mr. Yalincak's first, and only time being incarcerated, as he had no previous criminal record. During his incarceration at Wyatt, the Plaintiff was wholly dependent on the Defendants for the delivery of care to address his health care and mental care needs.

9. Defendant Cornell Companies, Inc. ("Cornell") is a for-profit corporation formed and existing under the laws of the State of Delaware and maintains a corporate agent in the State of Rhode Island. Cornell operates the Wyatt facility through Defendants Cornell Corrections of Rhode Island, Inc. ("Cornell RI"), and Central

Falls Detention Facility Corporation, Inc. ("CFDFC")(collectively "Cornell" or "Cornell Defendants"). Cornell is in the business of building, owning, operating, and managing correctional, detention, mental health, and residential treatment facilities in the United States. Defendant CFDFC has contracted with the U.S. Marshal Service, and others, and has also contracted with Defendants Cornell and Cornell RI, to operate the facility and employ the staff. As of December 2006, Cornell reports that it operates a total of 76 correctional, detention, and mental health facilities, with a capacity of over 18,356 beds. In 2006, Cornell had revenues totalling $360 million and profits of over $11.8 million. One of the correctional facilities built, owned, operated, and managed by Cornell, pursuant to a written contract with the United States Department of Justice through the BOP, USM, and various state authorities, is Wyatt. At all times relevant to this Complaint, Defendant Cornell had undertaken the duty to provide Constitutionally adequate medical care owed to Plaintiff. A copy of the 2006 Annual Report for Defendant Cornell, detailing the foregoing, is attached hereto as Exhibit A.

10. Defendant Warden Wayne T. Salisbury, Jr. ("Salisbury") was, at the time of the events giving rise to this complaint, the Warden for the Donald W. Wyatt Detention Facility ("Wyatt"), located at 950 High Street, Central Falls, Rhode Island 02863, and was responsible for the care and custody of the inmates at Wyatt.

11. Defendant Associate Warden John Doe 1 ("Doe 1") was, at the time of the events giving rise to this complaing, the Associate Warden for the Donald W. Wyatt Detention Facility ("Wyatt"), and was responsible for the care and custody of the inmates at Wyatt.

12. Defendant Jean Singleton ("Singleton") was, at the time of the events giving rise to this complaint, the Senior Counselor and Program Administrator for the Donald W. Wyatt Detention Facility ("Wyatt"), and was responsible for the care and custody of the inmates at Wyatt.

13. Defendant Linda Lugo ("Lugo") was, at the time of the events giving rise to this complaint, the Senior Counselor and Program Administrator for the Donald W. Wyatt Detention Facility ("Wyatt"), and was responsible for the care and custody of the inmates at Wyatt.

14. Defendant Patrick Toolin ("Toolin") was, at the time of the events giving rise to this complaint, the Counselor for C-Pod at the Donald W. Wyatt Detention Facility ("Wyatt"), and was responsible for the care and custody of the inmates at Wyatt.

15. Defendant June M. Carlton ("Carlton") was, at the time of the events giving rise to this complaint, the Counselor for A-Pod and B-Pod at the Donald W. Wyatt Detention Facility ("Wyatt"), and was responsible for the care and custody of the inmates at Wyatt.

16. Defendant Frank Botello ("Botello") was, at the time of the events giving rise to this complaint, a Captain at the Donald W. Wyatt Detention Facility ("Wyatt"), and upon information and belief, is now a Major, and was responsible for the care and custody of the inmates at Wyatt.

17. Defendant Jane Doe 1 a/k/a C.O. Falcon ("Falcon") was, at the time of the events giving rise to this complaint, a

correctional officer at the Donald W. Wyatt Detention Facility ("Wyatt"), and was responsible for the care and custody of the inmates at Wyatt.

18. Defendant Jane Doe 2 a/k/a C.O. Morales ("Morales") was, at the time of the events giving rise to this complaint, a correctional officer at the Donald W. Wyatt Detention Facility ("Wyatt"), and was responsible for the care and custody of the inmates at Wyatt.

19. Defendant John Doe 3 a/k/a Sgt. Gomes ("Gomes") was, at the time of the events giving rise to this complaint, a Sergeant at the Donald W. Wyatt Detention Facility ("Wyatt"), and was responsible for the care and custody of the inmates at Wyatt.

20. Defendant Jane Doe 3 a/k/a Nurse Maureen ("Maureen") was, at the time of the events giving rise to this complaint, a nurse in the medical department of the Donald W. Wyatt Detention Facility ("Wyatt"), and was responsible for the care and custody of the inmates at Wyatt.

21. Defendant Jane Doe 4 a/k/a Nurse Lisa ("Lisa") was, at the time of the events giving rise to this complaint, a nurse in the medical department of the Donald W. Wyatt Detention Facility ("Wyatt"), and was responsible for the care and custody of the inmates at Wyatt. Upon information and belief, Lisa left her employment at the Wyatt Facility in or about 2007.

22. Defendant Luis A. Cerbo ("Cerbo") was, at the time of the events giving rise to this complaint, a psychologist in the medical department of the Donald W. Wyatt Detention Facility

("Wyatt"), and was responsible for the care and custody of the inmates at Wyatt.

23. Defendant John Riedel ("Riedel") was, at the time of the events giving rise to this complaint, the medical doctor in the medical department of the Donald W. Wyatt Detention Facility ("Wyatt"), and was responsible for the care and custody of the inmates at Wyatt.

24. Defendant John Doe 4 a/k/a Lieutenant Mougenot ("Mougenot") was, at the time of the events giving rise to this complaint, a Lieutenant on third shift at the Donald W. Wyatt Detention Facility ("Wyatt"), and was responsible for the care and custody of the inmates at Wyatt.

25. Defendant John Doe 5 a/k/a Sergeant Doe 5 ("Doe 5") was, at the time of the events giving rise to this complaint, a Sergeant at the Donald W. Wyatt Detention Facility ("Wyatt"), and was responsible for the care and custody of the inmates at Wyatt. Sergeant Doe 5 is a brown to dark skinned individual, who reports to have an "Irish-mix" in his background; is between 5'10 and 6' in height; and was promoted to the rank of Lieutenant in or about 2007.

26. At all times pertinent hereto, all of the above named individual Defendants were employees, agents, or subcontractors of Defendant, Cornell, and were acting within the scope of their employment, agency, or contractual obligations and under color of state law. Cornell is responsible and liable for the acts, and omissions of each Defendant pursuant to the doctrine of respondeat superior.

## JURISDICTION AND VENUE

26. This Court has subject matter jurisdiction over Plaintiff's Constitutional claims pursuant to 28 U.S.C. §1331, as those claims are brought pursuant to Bivens v. Six Unknown Named Agents of the Federal Bureau of Narcotics, 403 U.S. 388 (1971), and 42 U.S.C. §1983, and arise under federal law.

27. This Court has subject matter jurisdiction over Plaintiff's common law claims pursuant to 28 U.S.C. §1332(a)(1) and 28 U.S.C. §1367(a).

28. Venue is proper pursuant to 28 U.S.C. §1391.

## STATEMENT OF FACTS

### A. CORNELL'S PER DIEM RATE WITH THE DOJ (USM, BOP, AND ICE)

29. The Wyatt Facility was financed with municipal bonds issued through the Rhode Island Port Authority in the summer of 1992 and opened in 1993.

30. Pursuant to federal law, the USM, the BOP, and ICE, i.e., divisions within the DOJ, generally have the authority to designate the place of any prisoner's pretrial detention and/or incarceration. However, the federal government is able to reduce its expenditures for those prisoners, and thus meet budgetary constraints, by housing such prisoners at private prisons such as Wyatt. Specifically, according to Cornell's Corporate filings with the SEC, "revenues has been generated under contracts specify a net rate per day per resident, or per diem rate." This rate for Wyatt is approximately $83 per inmate, per day, while in a non-private prison, according to the Bureau of Prisons ("BOP"), it costs

the federal government between $194 and $250 per inmate, per day. Thus, by housing a portion of its pretrial detention population in private prisons, the USM is able to reduce its expenditures for those prisoners, and meet budgetary constraints.

B. <u>CORNELL'S OBLIGATION TO PROVIDE CONSTITUTIONALLY ADEQUATE MEDICAL, DENTAL, AND MENTAL HEALTH CARE</u>

31. Upon information and belief, the Cornell Companies through a contract with the USM, BOP, and ICE, i.e., divisions of the DOJ (hereinafter the "Wyatt Contract") agreed to provide to, and for the benefit of Wyat prisoners, such as in the Plaintiff's situation, Constitutionally adequate medical and mental health care. The Wyatt Contract spells out in great detail the services that Cornell is required to provide to, and for the benefit of, Wyatt prisoners:

a. Cornell is required to provide "all essential health services" and to adhere to "the U.S. Constitution," and "all applicable Federal, state and local laws and regulations governing the delivery of health services and establish the necessary quality controls to ensure all policies and procedures are designed and implemented in a manner to promote orderly and efficient delivery and management of health services to the inmate population."

b. Cornell is required to have written plans and procedures for "providing urgent medical, health, mental health and dental services...includ[ing] but not limited to, the following: (1) 24 hour-a-day, seven day-a-week emergency medical, health, mental health and dental care; (2) initial health screening; (3) health appraisal examination; (4) daily triaging of complaints; (5) sick call procedures; (6) special medical programs and services for, but not limited to, inmates with chronic needs or requiring convalescent care; (7) mental health and substance abuse services; (8) staffing/health care specialist; (9) ancillary services-radiology, laboratory, etc.; (10) dental services-routine and emergency;

(11) pharmaceutical services and supplies; (12) optometric services; (13) health education; (14) medical diets; (15) infectious diseases; and (16) quality control/peer reviews."

c. Cornell is required to submit "all plans, policies and procedures" at Wyatt, including but not limited to training materials, to the respective DOJ Agency for "review and concurrence." Cornell is prohibited from making modifications to those plans, policies and procedures without the respective DOJ Agency's acknowledgement.

d. Cornell is required to submit all proposed hirings of personnel at Wyatt to the DOJ. THe respective DOJ Agency, i.e., USM, BOP, and/or ICE, alone may grant approval for the employment of any personnel at Wyatt. Such Agencies are "the final approval authority for all [Wyatt] staff who work with Federal inmates..."

e. "[E]ach phase of the services rendered under [the Wyatt Contract] is subject to [BOP/USM/ICE] inspection both during operations and after completion of the tasks." The contract provides for on-site BOP/USM/ICE personnel to "monitor contract performance" by Cornell.

f. The Cornell Contract provides that an on-site USM/BOP/ICE representative, known as the "Contracting Officer's Representative," act as the "contract monitor" and be "responsible for the technical direction of the performance of all work under [the Wyatt] Contract."

g. The contract mandates that Wyatt comply with the Uniform Building Code, the Building Officials and Code Admnistrators National Building Code (BOCA), and the Standard Building Code if mandated by the State of Rhode Island, and if not, BOCA, as well as the Architectural Barriers Act of 1968, the Rehabilitation Act of 1973, and the Uniform Federal Accessibility Standards.

h. Cornell is required to submit final "design/construction documents" to the USM/BOP/ICE, and allow "periodic visits...to verify...compliance with contract requirements."

32. The Wyatt contract is a fixed price contract providing for a set payment to Cornell per time period, irrespective of Cornell's costs of providing the services, including health care services, required by the USM/BOP/ICE. Thus, to the extent that

Cornell is able to reduce the costs of the medical and mental health services offered at Wyatt, Cornell's profits are increased.

## C. DEFENDANTS' UNCONSTITUTIONAL AND ILLEGAL ORGANIZATIONS, SYSTEMS, PATTERNS AND PRACTICES AT WYATT BETWEEN JUNE 16, 2005 AND JANUARY 5, 2007

33. It is well known to Defendants that the population of persons incarcerated in federal prisons suffer from the full spectrum of routine medical problems found in the general population, such as fractures, abdominal pains, psychological disorders, and infectious, as well as chronic diseases such as asthma, hypertension, epilepsy, diabetes, tuberculosis, and HIV. It is also well known to Defendants that prisoners suffer from a higher rate of serious medical, dental, and mental health problems, chronic conditions, and injuries than does the American population as a whole.

35. Defendants were deliberately indifferent to the Plaintiff's serious medical and mental health care needs during the period June 16, 2005 to January 5, 2007, as a result of the Wyatt health care delivery system illustrated below, and detailed in Part E supra:

a. Wholly Insufficient Staffing, Training and Supervision-- The number of qualified health care staff at Wyatt is wholly inadequate to provide care to Wyatt's 1,000 residents. On information and belief, the lone medical doctor, John Riedel, who treats and supervises the care of all the prisoners at Wyatt also maintains a full-time medical practice in a local community. There is only one part-time dentist on staff, who sees patients less frequently than does the doctor. There is no physical therapist on staff or available on a contract basis for prisoners. There is only one part-time english speaking psychologist, Luis A. Cerbo, who attends to prisoners at Wyatt on an irregular basis. The number of

medical staff is grossly inadequate to meet the significant and documented medical, dental and mental health needs of the prisoners at Wyatt. The inadequate staffing is due, in part, to the fact that Defendants: (i) do not actively attempt to recruit and hire sufficient, competent medical staff; (ii) fail to train and supervise medical personnel; and (iii) are unable to retain those medical staff members who are hired. As a consequence of the severe staffing shortage, corrections officers with little or no health care training often serve as the gatekeepers for inmates, as was the case with the Plaintiff, access to routine and even emergency medical care, leading to acute medical crises.

b. Grossly Inadequate Access to Health Care-- Defendants routinely and knowingly fail to provide prisoners, as was the case with the Plaintiff, with access to essential health care. Prisoners suffering from serious and even acute conditions are habitually and indiscriminately denied treatment. When prisoners do manage to see the part-time Wyatt doctor, they are frequently denied care for complex, multi-symptom ailments on the arbitrary ground that the doctor will not treat more than one condition per appointment. There is a substantial backlog of requests for routine and amergency medical and dental care, resulting in frequent and dangerously lengthy delays in accessing care. Prisoners often face substantial delays and regular denials of treatment when they want to see a primary physician; when they need a referral to see a specialist; when they need to be transported to a specialist for examination after obtaining a referral; when they need to obtain medical testing; and when they need treatment. Mental health care services are wholly inadequate: there is only one trained english speaking psychologist on staff, and there is no psychiatrist, thus, the inmates are prescribed psychotropic medications by the psychologist who makes a referral to the Wyatt doctor. In addition, physical therapy services are simply not offered. Prisoners who have worn glasses for years are simply told that they no longer need them. On information and belief, the foregoing is as a result of the Defendants efforts to avoid the costs of such care.

c. Denial of Access to Qualified Medical Services Outside the Facility-- Wyatt medical staff routinely refuse to refer prisoners to outside health care providers even in situations where the prisoner's medical, dental, or mental health conditions far exceed the therapeutic capabilities of Defendants or their facilities, and where treatment would be a necessary component of Defendants' obligation

to provide legally mandated care. Defendants' failure to refer prisoners to off-site specialists has in some cases resulted in great suffering by prisoners, and has led to serious, and entirely avoidable, medical complications. On information and belief, laboratory and other medical testing services at Wyatt are routinely delayed, never done, or not reported. By way of example, there occurred a MRSA outbreak in A-Dorm in or about August, 2005. In that instance, one inmate named Eric Smith developed a six (6) inch growth of pus on his leg, which was left untreated for months before intervention by his attorney and his sentencing court. Infectious conditions such as MRSA are not typically cultured, even though BOP guidelines recognize that this is an essential step in diagnosing MRSA, determining an effective antibiotic or treatment regimen, and avoiding the creation of resistant strains of the infections and outbreaks among the prisoners.

d. <u>Failure to Provide Proper Medications And Arbitrary Discontinuation of Prescription Drugs</u>-- Arriving prisoners' prescription medications are routinely confiscated without regard to the impact on the prisoner's health. Prisoners often have to wait a week or more before receiving substitute medications at Wyatt. Determinations regarding medication regimens, and the composition of those regimens, are made based on the cost of the medications to Cornell rather than the best interests of the patient. Prisoners' medications are arbitrarily changed to less expensive medications without follow up to assess the efficacy and side effects of the new medications. As a result, many prisoners have simply been denied necessary medication altogether as a cost-saving measure for the facility.

e. <u>Failure to Provide Meaningful Grievance Process</u>-- The Wyatt administrative grievance system is broken. The process involves, first, a "Health Request" and, second, a "Grievance to the Warden." However, the Wyatt grievance system often does not provide timely or adequate responses, and sometimes no response at all, about medical, dental, or mental health care. In point of fact, Health Requests are always responded to by the Wyatt medical department secretary; and the Grievance to the Warden, during the Plaintiff's incarceration, was addressed by a single staff member, Patrick Toolin. In addition, prisoners wishing to grieve about medical care they have received (or have not received) are frequently stymied by counselors who tell them that "today is not a good day to file this grievance," or who state that they are "too busy" to take or process written complaints. Some prisoners have been cautioned that they will no longer receive care because they have

grieved, and have accordingly chosen not to pursue grievances for fear that they will be denied the care they need. Additionally, in some instances, medical staff members, and Wyatt security personnel have destroyed or disposed of grievances submitted by prisoners in their care. Prisoners who complain frequently about the deficiencies in health care have been punished with "administrative segregation"--solitary confinement--which is punitive to the prisoner. Thus, by erecting obstacles to filing a grievance, and through threats and acts of retribution Wyatt staff have effectively discouraged or foreclosed meaningful access to the grievance process for many inmates.

36. Despite Defendants' actual and constructive knowledge of these and other significant failures and deficiencies in the organizations, systems, policies, and practices for the delivery of medical, dental, and mental health services at Wyatt, Defendants have refused or consciously ignored the need to take immediate actions to protect the Plaintif, and, upon information and belief, many other prisoners at Wyatt.

## D. CORNELL"S SEVEN KEY PRINCIPLES OF CARE ("PRINCIPLES OF CARE")

37. THe above described system of health care delivery is not only Unconstitutional and Illegal but also violate the very "Principles of Care" publicly propagated by Cornell; in sum, Cornell describes the following as its principles:

a. "These principles state that [Cornell's] operations must maintain the safety and security of our clients, our employees, and the local community."

b. "In addition, the principles require that we hold the individuals in our care accountable for their actions and expect them to assume responsibility."

c. "Furthermore, we expect our employees to act as role models, to communicate effectively and professionally, and to treat our clients with dignity and respect."

d. "Finally, our principles call for us to manage physically clean and appropriately maintained facilities that are safe and conducive to an environment of care." (Exhibit A, p.3).

## E. DEFENDANTS' ACTS CAUSE HARM TO THE PLAINTIFF

### 1. November 21, 2005 Incident

#### (a) The Incident

38. When the Plaintiff arrived at Wyatt on June 16, 2005, he received a skin test for tuberculosis ("TB"), and was subsequently placed on INH and Vitamin B6 regimen, twice a week for a six month period under the supervision of Defendant Cornell, Defendant Riedel, Defendant Salisbury, Defendant Doe 1, Defendant Maureen, and Defendant Lisa, as well as other individuals in the Wyatt medical department.

39. Proximate to the date of Monday, November 21, 2005, Defendant Lisa provided the Plaintiff with his morning medication after which the Plaintiff returned to his assigned bed in A-Dorm from "med-line."

40. Shortly therafter, the Plaintiff woke up to go to the bathroom, became lightheaded and informed the correctional officer on duty and blacked out in the A-Dorm dayroom. Defendant Falcon was the correctional officer on duty in A-Dorm during this incident.

41. Thereafter, the Plaintiff, while semi-conscious, was taken to the Wyatt medical department where Defendant Riedel began repeatedly taking the Plaintiff's blood pressure and monitoring his breathing, which was shallow, and it revealed the Plaintiff's blood pressure had dropped to 60 over 30, a second blood pressure test revealed 70 over 30, and the Plaintiff two hours after the incident was released back to A-Dorm. The Plaintiff was not taken to an outside

hospital, his cries of physical pain (because of his difficulty in breathing) were not addressed and, despite reasonable inquiries by the Plaintiff, the Plaintiff was not informed of why his blood pressure had suddenly dropped to such a low level and why he was gasping for air.

42. As a result of the November 21, 2005 incident, the Plaintiff complained of pain and discomfort to Defendant Counselor Carlton and Defendant Counselor Toolin, and was recalled to medical later that day for an EKG and two more times the same week.

43. Shortly thereafter, Defendant Lisa, during afternoon medline, informed the Plaintiff, "I am sorry but I gave you someone else' medication by accident this morning. Are you feeling better now?"

44. Despite the foregoing, the Plaintiff was never taken to an outside hospital, never informed of what medication he was given that caused his blood prssure to dramatically drop, or seen again by the Wyatt doctor for a follow-up.

45. Thereafter, the Plaintiff filed four (4) written requests to medical, as well as Defendant Patrick Toolin who was the Grievance Coordinator and not one response was received by the Plaintiff.

(b) <u>Harm to Plaintiff</u>

46. As a result of the foregoing, the Plaintiff was committed to bed rest for a period of five (5) days.

47. Defendants' deliberate indifference and reckless behavior to Plaintiff's serious medical needs caused avoidable pain, mental health, and deterioration of Plaintiff's health.

48. Defendant Salisbury, Defendant Doe 1, and Defendant Riedel knew to a moral certainty that they are charged with administering and providing inmates with Constitutionally adequate medical and mental health care.

49. Defendant Salisbury, Defendant Doe 1, and Defendant Riedel knew that proper training and supervision of the nursing staff at Wyatt was necessary to adequately provide inmates with Constitutionally adequate medical and mental health care and were deliberately indifferent, grossly negligent, and acted with reckless disregard in administering medical health care to the Plaintiff on November 21, 2005 with excessive risk to his health and safety, and such conduct was done without lawful justification and was designed to and did deprive Plaintiff of his rights guaranteed by the Eighth Amendment to the U.S. Constitution.

50. The conduct of Defendants Salisbury, Defendant Doe 1, and Defendant Riedel in failing to provide adequate training and supervision to Defendant Lisa and other personnel in the medical department at Wyatt, and their failure to take the Plaintiff to an outside hospital involved reckless or callous indifference to Plaintiff's federally protected rights.

51. The Defendants' organizations, systems, policies, procedures, practices, acts, and omissions all evidence and constitute cruel and unusual punishment in violation of the Eighth Amendment to the United States Constitution.

2. September 20, 2006 Incident

(a) Background

52. By way of background, in the period of in or about June 2006 through August 2006, the Plaintiff reported to Defendant Carlton, Defendant Singleton, Defendant Lugo, Defendant Toolin, Defendant Riedel, and Defendant Cerbo that he was feeling depressed.

53. Thereafter, the Plaintiff was seen by Defendant Riedel and Defendant Cerbo and while Defendant Cerbo recommended Fluoxetine hydrochloride (commonly marketed as Prozac), Defendant Riedel advised the Plaintiff that due to the Plaintiff's past negative reaction to Prozac that he would not place the Plaintiff on the medication. Defendant Riedel further advised the Plaintiff "you are not really depressed...you just dont want to deal with your problems."

54. Thereafter, the Plaintiff met with Defendant Lugo and Defendant Cerbo, again, and was placed on Prozac by Defendant Riedel without further consultation.

55. The Plaintiff was advised by Defendants Lugo, Carlton, and Toolin that he was being "well taken care of."

56. However, the Defendants failed to properly administer the medication and monitor the Plaintiff. Specifically, the Defendants:

a. failed to monitor, or adequately supervise the nurse dispensing the medication, as routinely, the Plaintiff was taking a single dosage of Prozac as much as three times a day (60 mg), and was advised that if he missed medline (where medication was dispensed) he would be disciplined by Wyatt Staff. This was despite the fact that he was only suppose to take one dosage.

b. On numerous occasions the Plaintiff attempted to advise Defendant Riedel, via a written Health Request, that the nurse was administering as much as triple the dosage (20 mg) that he had authorized, and such concerns were never responded to.

c. Despite FDA warnings to the contrary, while the Plaintiff was on Prozac, he was also placed on a highly addictive benzodiazapine named Klonopin.

d. The Plaintiff was also never advised, and the Defendants failed to properly detail and monitor the substantial risks associated with Prozac, and the very combination he was prescribed, despite being aware of such risks, and were reckless, by failing to observe that Prozac in some individuals actually increased the risk of suicide. Specifically, according to the FDA "Prozac and drugs like it...mak[e] healthy people with no history of mental health illness feel suicidal." A collective copy of the "Prozac May Encourage Suicide", May 22, 2000 BBC News, Prozac Linked to Child Risk Suicide", September 13, 2003 USA Today News, are attached hereto as Exhibit B.

e. According to the FDA, Prozac "increased risks of suicidal thinking and behavior known as suicidality, in young adults ages 18 to 24 during initial treatment (generally the first one to two months)." Exhibit B, supra.

f. The Defendants failed to monitor and address such concerns as the Plaintiff began exhibiting suicidality.

(b) The Incident

57. On September 20, 2006, the Plaintiff, at approximately two (2) in the morning ingested a sharpened small paper clip and shortly thereafter began spitting up blood, and shaking uncontrollably.

58. Inmate Cory Brown immediately notified Wyatt Staff, Defendant Lt. Mougenot, and Defendant Sgt. Doe 5.

59. Defendant Lt. Mougenot, and Defendant Sgt. Doe 5 came and met the Plaintiff in A-Dorm, and inspected his clothes and bed sheets, which were stained with blood.

60. Defendant Lt. Mougenot advised the Plaintiff "you fucking piece of shit...now you got to go to the hospital."

61. Defendant Doe 5 advised the Plaintiff, "wait till you come back Turk...I am going to make your life hell."

62. Thereafter, the Plaintiff was then taken to a local hospital by C.O. staff and an x-ray revealed that a metal object was lodged in his stomach. The hospital medical staff advised the correctional officer staff and Defendant Lt. Mougenot and advised them of the results, and further advised the Plaintiff, that "you should be monitored for a few days until this object passes" and that "you should be on a liquid diet."

63. Shortly thereafter, the Plaintiff was informed that Defendant Lt. Mougenot would "not authorize the Plaintiff being hospitalized" (i.e., being kept at the hospital). As a result, the Plaintiff was discharged shortly after 7 a.m., and was advised that the Wyatt staff should closely monitor the situation.

64. Upon the Plaintiff's return to Wyatt, the Plaintiff was placed in segregation, denied a liquid diet and was not seen by the Wyatt medical doctor, Defendant Riedel. Instead, a Wyatt medical assistant took an x-ray of the Plaintiff's stomach and when the Plaintiff requested to see the doctor, he was advised, in part, "stop whining."

65. Throughout the day on September 20, 2006, Plaintiff informed every officer and counselor on duty in segregation in B-Unit lockdown that he was in significant pain, and that he had not received any medical attention from the Wyatt doctor, Defendant Riedel. Plaintiff received no medical attention from the Wyatt

doctor on September 20, 2006.

66. Throughout the day on September 21, 2006, Plaintiff informed every officer on duty in segregation in B-Unit lockdown and Defendant Lugo, Defendant Carlton, Defendant Singleton, Defendant Botello, Defendant Maureen, Defendant Riedel, and Defendant Buckless, as well as Sgt. Gomes that he was in excruciating pain, and that he had not received any medical attention from the Wyatt doctor, Defendant Riedel. Plaintiff received no medical attention from Defendant Riedel on September 21, 2006.

67. On September 21, 2006, the Plaintiff was served with an incident report charging him with (a) self-mutilation and (b) conduct which disrupts.

68. Throughout the day on September 21, 2006, the Defendants provided three (3) eight-ounce styrofoam cups to the Plaintiff to "spit up blood". At this time as a result of the September 20, 2006 incident, the Plaintiff was bleeding profusely.

69. Throughout the day on September 22, 2006, Plaintiff informed every officer on duty in segregation in B-Unit lockdown and Defendant Lugo, Defendant Carlton, Defendant Singleton, Defendant Botello, Defendant Maureen, Defendant Riedel, and Defendant Buckless in writing, as well as Sgt. Gomes that he was in excruciating pain, and that he had not received any medical attention from the Wyatt doctor, Defendant Riedel. Plaintiff received no medical attention from Defendant Riedel on September 22, 2006.

70. From September 20, 2006 through September 29, 2006, Plaintiff submitted seven (7) written requests for medical attention, some of which were submitted to and received by Defendant Lt. Mougenot. Only two (2) of those seven requests were forwarded to Wyatt medical staff, and all of those requests were ignored.

71. Between September 20, 2006 and approximately September 27, 2006, Defendants Lugo and Botello visited the Plaintiff in B-Unit lockdown and observed that the Plaintiff had three cups filled with blood and continued to be bleeding and were informed by the Plaintiff that he was now bleeding when he went to the restroom. Nevertheless, the Plaintiff received no medical attention from Defendant Riedel during this time period.

72. Between September 20, 2006 and approximately September 27, 2006, the Plaintiff also informed Defendant Lt. Mougenot and Defendant Sgt. Doe 5 of his condition and was advised, "you need to stop complaining if you want to get out of seg[regation]" by Sgt. Doe 5. Despite the Plaintiff's repeated requests for medical attention, none of the officers, counselors, or other employees of Cornell sought medical attention on his behalf.

73. From September 20, 2006 through September 27, 2006, it was apparent that Plaintiff was seriously injured, in severe pain, and in need of immediate medical attention. Nevertheless, none of the officers, counselors, or other employees of Cornell sought medical attention on his behalf.

74. From September 20, 2006 through September 27, 2006, Defendants Warden Synder, Associate Warden Doe 1, Singleton,

Lugo, Carlton, Toolin, Botello, and Riedel were repeatedly contacted via telephone and letter by the Plaintiff's criminal defense attorney of Bernard Grossberg; his father, Dr. Omer B. Yalincak' his mother, Mrs. Ayfer Yalincak; his family friends, Dr. Robert McKay; his immigration attorney of Edwin T. Gania; and Nevzat Beyazid of the Turkish Consulate-New York office. Nevertheless, none of the officers, counselors, or other employees of Cornell sought medical attention on his behalf.

(c) Harm to Plaintiff

75. As a result of the Defendants' failure to provide adequate medical treatment to the September 20, 2006 incident, as described herein, the Plaintiff lost substantial amounts of blood and was not able to eat solid foods, was not provided a liquid diet or any other substitute, resulting in substantial weight loss over the next one month period.

76. As a result of the Defendants' deliberate indifference, and reckless and callous indifference, in failing to provide adequate medical treatment, as described herein, Plaintiff suffered, and continues to suffer, chronic and substantial physical pain and impairment.

77. As a result of the Defendants' deliberate indifference, and reckless and callous indifference, in failing to provide adequate medical treatment, as described herein, Plaintiff has suffered serious emotional and mental harm.

78. Defendant Salisbury, Defendant Doe 1, and Defendant Riedel, as employees of Cornell, knew to a moral certainty that

they are charged with administering and providing inmates with Constitutionally adequate medical and mental health care.

79. Defendant Salisbury, Defendant Doe 1, and Defendant Riedel knew that proper training and supervision of the nursing staff at Wyatt was necessary to adequately provide inmates with Constitutionally adequate medical and mental health care and were deliberately indifferent, grossly negligent, and acted with reckless disregard in administering medical health care to the Plaintiff in response to the September 20, 2006 incident with excessive risk to his health and safety, and such conduct was done without lawful justification and was designed to and did deprive Plaintiff of his rights guaranteed by the Eighth Amendment to the U.S. Constitution.

80. The conduct of Defendants Salisbury, Defendant Doe 1, and Defendant Riedel in failing to provide adequate training and supervision to the Wyatt medical staff and correctional officers, and their failure to treat the Plaintiff, other than providing him styrofoam cups to spit up blood, as well as their failure to provide the Plaintiff with a replacement diet and review the Plaintiff's drug regimen as administered by the Wyatt medical staff involved reckless or callous indifference to Plaintiff's federally protected rights.

81. The Defendants' organizations, systems, policies, procedures, practices, acts, and omissions all evidence and constitute cruel and unusual punishment in violation of the Eighth Amendment to the United States Constitution.

3. October 29, 2006 Incident

(a) Background

82. In or about October 2006, the Plaintiff continued to be on the antidepressant Prozac, and his dosage of Klonopin, as a result of his continued anxiety, was increased by fifty percent (50%) (collectively with the Prozac, "the medication regimen").

83. Throughout the month of October 2006, the Plaintiff's father, Dr. omer B. Yalincak, who is a medical doctor, and his mother, Ayfer Yalincak, and his attorney, Bernard M. Grossberg, repeatedly called Wyatt staff and advised them that the Plaintiff, since being put on the medication regimen, had increased suicidal tendencies, and had spoken of killing himself.

84. On or about October 22, 2006, the Plaintiff immediately requested to see the psychologist, Defendant Cerbo, by delivering a Health Request to the medical staff, and advising every officer, counselor, Wyatt staff member, that he required immediate medical and/or mental health care.

85. Thereafter, on October 29, 2006, the Plaintiff slashed his left forearm from his wrist to approximately his elbow with a regular razor and opened an 8.5" by 0.25" gash (hereinafter "the gash").

86. Thereafter, the Plaintiff continued to seek someone to talk to and treated himself in the interim by wrapping the gash with paper towels, worn out socks, and worn out Wyatt issued underwear.

87. Thereafter, the Plaintiff, yet again, placed more Health Request forms to the medical department at Wyatt.

88. On Wednesday, November 1, 2006, the Plaintiff at approximately 6-7 p.m. was seen in medical by Defendant Cerbo. The Plaintiff showed Defendant Cerbo the gash, and advised him of his severe pain and suicidal tendency "over the past few weeks" and that he was afraid that he would be locked up in segregation and charged with self-mutilation. Defendant Cerbo stated that he would need to report the gash to the correctional officers on duty, and that if the Plaintiff advised them it was a habitual cut (i.e., "you are a cutter"), it would not be "serious punishment."

89. Immediately thereafter, a Wyatt medical staff member removed the paper towels and clothing on the Plaintiff's arm, measured the gash to be 8.5" by 0.25". Subsequently, Defendant Maureen, upon seeing the Plaintiff's gash, treated the gash by applying gauze wrap to the Plaintiff's arm and stated "you jackass...look what you did."

90. Thereafter, upon information and belief, the on-call sergeant was contacted, who in turn contacted Defendant Salisbury, Associate Warden Defendant Doe 1, Defendant Botello, Defendant Singleton, and Defendant Lugo.

91. Thereafter, the Plaintiff was escorted by Wyatt staff to administrative segregation in B-Unit lockdown, charged with self-mutilation, and housed with another inmate named Keith Riedell.

92. Despite repeated requests on November 1, 2006 by the Plaintiff, and despite his repeatedly informing the Defendants that he was in excruciating pain, the Plaintiff was never seen by the Wyatt medical doctor, Defendant John Riedell; the Plaintiff was not taken to an outside hospital for stitches despite profuse bleeding and the size of the gash; the Plaintiff was not given any antibiotic to protect him from infection given his open wound and, instead, was given a clear garbage bag to wrap around his gash for showers only; and the Plaintiff was not given any pain medication for his excruciating pain stemming from the 8.5" gash on his left forearm.

93. Throughout November 2, 2006 through approximately November 11, 2006, the Plaintiff contacted his father, Dr. Omer B. Yalincak; his mother, Ayfer Yalincak; his sister, Hale Yalincak; his attorney, Bernard M. Grossberg; his parents attorneys, Edwin T. Gania, Robert A. Byers, and Gordon Mehler; and Nevzat Beyazid of the Turkish Consulate-New York office searching for help. In turn, each of these individuals placed a total of forty (40) calls to Wyatt staff, including but not limited to, Defendant John Riedel, Defendant Luis A. Cerbo, Defendant Warden Salisbury, Defendant Associate Warden Doe 1, Defendant Jean Singleton, Defendant Linda Lugo. Defendant June M. Carlton, Defendant Patrick Toolin, and Defendant Captain Frank Botello.

94. In addition, the Plaintiff submitted twenty-one (21) written Health Requests and/or letters requesting treatment for his gash, and requesting that he be released from administrative

segregation to Wyatt staff, some of which were received by Defendant Warden Salisbury, Defendant Associate Warden Doe 1, Defendant Singleton, Defendant Carlton, Defendant Toolin, Defendant Botello, Defendant Buckless, Defendant Morales, Defendant Falcon, Defendant Sgt. Gomes, Defendant Lt. Mougenot, and Defendant Sgt. Doe 5. Nevertheless, none of the officers, counselors, or other employees of Cornell sought medical attention on his behalf and none of his numerous letters or written requests received a written response and were ignored.

95. As a result of the substantial number of grievances, letters and requests placed by the Plaintiff, as well as the Plaintiff's family, friends, and attorneys, the Plaintiff upon being released from segregation on or about November 11, 2006 was seen by Defendants Lugo and Botello and was advised that "until you get your people [family] to stop calling us you are not going to get your legal work back or go back to A-Dorm."

96. Upon being moved to C-Unit, the Plaintiff continued to submit written requests to the Defendants, requesting that he be taken to an outside hospital for treatment, and that he be treated for his excruciating pain.

97. In addition, the Plaintiff informed his C-Unit counselor, who was also the grievance coordinator, Defendant Patrick Toolin, as well as Defendant Warden Salisbury, Defendant Associate Warden Doe 1, Defendant Singleton, Defendant Lugo, Defendant Carlton(his prevous A-Dorm Counselor), Defendant Botello, Defendant Nurse Maureen, Defendant Riedel, Defendant Cerbo, Defendant Lt. Mougenot, and Defendant Doe 5 of the very unsanitary

conditions at C-Unit: wide spread excrement-sewage- in the C-Unit dayroom (where everyone in the unit eats), as a result of plumbing problems in connection with construction at Wyatt. This would occur once a day, whenever anyone flushed in the Unit, and the sewage had built up, and would then flood the C-Unit dayroom, and routinely the cells, such as the Plaintiff's which was located on the bottom tier. This sewage was then subsequently cleaned up by pod orderlies with a mop--by pushing the sewage water back into the drains. There was no disinfectant or other materials provided, and despite the Plaintiff having a large, open gash on his arm, he was forced to clean the C-Unit sewage out of the dayroom and out of his own cell, so at the very least, he can eat. The daily flooding continued for 30 days.

98. Between November 11, 2006 and December 20, 2006, the Plaintiff remained in excruciating pain and developed an infection in his open gash.

99. Between November 11, 2006 and December 20, 2006, when the Plaintiff complained of the conditions in C-Unit, and his own medical conditions to Defendant C.O. Morales, Defendant Buckless, Defendant Lt. Mougenot, and Defendant Sgt. Doe 5, the C-Unit officers who were on duty, the Plaintiff was advised by C.O. Buckless "you think this prison is bad...you ever see what happened in Midnight Express [a movie about a Turkish prison]". The Plaintiff was advised by Defendant Lt. Mougenot and Defendant Sgt. Doe 5 to "stop the fucking whining" and was denied access for two (2) weeks to his own legal materials.